Richard Leo DEORLE, Plaintiff–
Appellant,

v.

Greg RUTHERFORD, Butte County
Deputy Sheriff; Mick Grey, Butte
County Sheriff; County of Butte, De-
fendants–Appellees.

No. 99–17188.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 12, 2000

Filed March 16, 2001

Larry L. Baumbach, Law Offices of Larry L. Baumbach, Chico, California, for the plaintiff-appellant.

Michael R. Deems, Stewart, Humpherys, Burchett & Sandelman, Chico, California, for the defendants-appellees.

Before: BRIGHT,* REINHARDT, and SILVERMAN, Circuit Judges.

Opinion by Judge REINHARDT;
Dissent by Judge SILVERMAN.

REINHARDT, Circuit Judge:

Police Officer Greg Rutherford fired a "less lethal" lead-filled "beanbag round" into the face of Richard Leo Deorle, an emotionally disturbed resident of Butte County, California. Deorle was shot without receiving a warning and while unarmed. The projectile removed an eye and left lead shot implanted in his skull. We are presented on appeal with two issues: whether the force used was so excessive as to violate Deorle's fourth amendment rights; and, if so, whether Officer Rutherford is entitled to qualified immunity.

## BACKGROUND[1]

On September 9, 1996, in Butte County, California, Richard Deorle (Deorle), upset at being diagnosed with Hepatitis C, and having consumed a half-pint of vodka and some Interferon, his prescribed medication, began behaving erratically. By four o'clock, Deorle had become suicidal. According to Mrs. Deorle, having "lost control of himself," Deorle began screaming and banging on the walls of their house. In search of someone to help her with her distressed husband, Mrs. Deorle dialed 911.[2]

Her call was answered by the police, who dispatched Officer Mahon to the Deorle residence. Mrs. Deorle, accompanied by their children, left the house. Deorle did not hinder their departure. He did, however, rather angrily refuse to let

---

\* The Honorable Myron Bright, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

1. When we review an order granting summary judgment to the defendant, we must view the relevant facts in the light most favorable to the plaintiff. *Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir.1998). That standard also applies to our determination of the defendants' entitlement to qualified immunity as a matter of law. *See Moran v. Washington*, 147 F.3d 839, 844 (9th Cir.1998).

2. Mrs. Deorle testified that, when she dialed 911, Deorle was "just screaming. I don't remember any words, just screaming like in pain." She picked up the phone intending to get medical help, dialed 911, and left the phone on the dresser.

Mahon enter the house without a warrant. Mahon escorted Deorle's family one block from their house, radioed for "Code 3 Backup," and requested that more officers be sent quickly.

At least 13 officers responded to Mahon's request for "backup." [3] These officers set up roadblocks on the streets around the house to ensure that Deorle had no avenue of escape, and awaited the arrival of a Special Incident Response Team ("SIRT") and a team of negotiators. SIRT members are trained to "arrest ... suspects in the most efficient and least hazardous manner ... [and] arrest suspect[s] with a minimum amount of risk or danger to the ... suspect."

Deorle, though verbally intimidating, was physically compliant and followed all the officers' instructions. When a canine team "tested" his behavior by making their dog bark aggressively at Deorle, he retreated towards his house. When a wooden board from the porch railings came away in his hands, Deorle dropped it at the officers' command. Although shouting "kill me" and brandishing a hatchet at a police officer, he threw the hatchet away into a clump of trees when told to put it down. Officer Rutherford, who was at the scene for thirty to forty minutes, did not observe Deorle touch, let alone attack, anyone; he did, however, hear Deorle scream at him that he would "kick his ass." [4]

Rutherford was a member of the SIRT team. He was trained in the deployment of force against recalcitrant suspects and had arrived on the scene in response to Mahon's Code 3 call. After briefing by his superiors and consultation with another officer on the scene, he decided to reconnoiter closer to Deorle. Accompanied by officers Estes and Nichols, Rutherford observed Deorle for about five to ten minutes from the cover of some trees before Deorle, carrying an unloaded plastic crossbow in one hand [5] and what may have been a bottle of charcoal lighter fluid in the other, [6] started shouting at the officers. Rutherford was armed with a twelve-gauge shotgun loaded with what appellees term 'a "less-lethal" or "beanbag" round. These rounds are made of lead shot contained in a cloth sack, and are small enough to be fired from a shotgun. [7] The rounds "could have lethal capabilities" at thirty feet, and are potentially lethal up to fifty feet. [8]

3. Rutherford claims there were between five and ten police officers at Deorle's residence. Appellees' evidence in support of their summary-judgment motion suggests that at least thirteen officers were at the scene when Deorle was shot, and a police log indicates that as many as 24 officers may have been present before or immediately after the shooting.

4. Rutherford also stated that no-one reported to him that Deorle had touched or attacked anyone.

5. The dissent says that it is unclear whether the crossbow was loaded. If it were unclear, we would be required to assume for purposes of summary judgment that the crossbow was not loaded. Here, however, Rutherford, himself, acknowledged that the crossbow was unloaded when he observed Deorle. *See* Transcript of Deposition of Greg Rutherford, dated July 29, 1998 at 60:25–26.

6. In his deposition, Rutherford testified at various times that he observed a plastic bottle in Deorle's hand, but stated equally unequivo-

cally at other points that it was a can that he observed. He also stated that it was lighter fluid that Deorle was carrying because he could tell that from the type of container in Deorle's hand. Indeed, Rutherford said he could distinguish what type of lighter fluid it was—charcoal lighter fluid rather than that used to fill cigarette lighters—because of its container (apparently, whether that container was a can or a plastic bottle). We also note that Rutherford observed the can or bottle at a distance of more than thirty feet.

7. The shot is enveloped in cloth to prevent its spreading and peppering the target. The shot, thus encased, is expelled from a twelve-gauge shotgun at a speed of between 280 and 300 feet per second, and delivers a force sufficient to knock someone off his feet and render him incapable of resistance.

8. Transcript of Deposition of Greg Rutherford, dated July 29, 1998, at 99:23–24.

In response to Deorle's taunts, Rutherford shouted at him to put down the crossbow and Deorle "discarded" it.[9] According to Rutherford, Deorle then:

> walk[ed] directly at me at a steady gate [sic].... He didn't run at me, he didn't take his time getting to me, it was just a steady walk directly at me.... Once he started walking towards me I took a little wider stance with my feet to get a good stable base. As I leaned my weapon up against the tree to make it more stable and I focused on his lower right rib area as he was walking towards me for a target area.[10]

Rutherford did not warn Deorle that he was going to shoot him. Nor did he order Deorle to halt. Instead, he waited until Deorle reached the predetermined point, then fired. The cloth-cased shot struck Deorle in the face, knocked him off his feet, and lodged "half out of his eye." He suffered multiple fractures to his cranium, loss of his left eye, and embedded lead shot in his skull. A team of negotiators was still en route when Deorle was shot.

Deorle sued Rutherford, Mick Grey (the Butte County Sheriff), the County of Butte, and Defense Technology Corporation (the manufacturer of the cloth-cased shot), for, among other things, excessive force in violation of the fourth amendment. Rutherford and Grey asserted qualified immunity and moved for summary judgment. The district court held that Rutherford was entitled to qualified immunity, that he did not violate Deorle's right to be free from excessive force, and that there was therefore no basis for holding the other defendants liable. The court granted summary judgment for defendants and denied Deorle's motion for reconsideration.

This appeal followed. The excessive-force claim against Officer Rutherford, which was dispositive in the court below, is the only issue presented by the parties on appeal.

## STANDARD OF REVIEW

A court reviews de novo the issue of whether an officer's use of force was objectively reasonable under the circumstances. *See Liston v. County of Riverside,* 120 F.3d 965, 976 (1997). A district court's decision to grant summary judgment is also reviewed de novo. *See Crow Tribe of Indians v. Racicot,* 87 F.3d 1039, 1043 (9th Cir.1996).

## DISCUSSION

When government officials assert the defense of qualified immunity to an action under 42 U.S.C. § 1983, a court evaluating the defense must first determine whether the plaintiff has shown the deprivation of a constitutional right. *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). If so, the court then must determine " 'whether the right was clearly established at the time of the alleged violation,' " *id.* (quoting *Conn v. Gabbert,* 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999)), and whether a reasonable officer could have believed his conduct was lawful. *See Act Up!/Portland v. Bagley,* 988 F.2d 868, 871 (9th Cir.1993); *Mendoza v. Block,* 27 F.3d 1357, 1360 (9th Cir.1994). Accordingly, we first examine whether the force used to subdue Deorle was excessive as a matter of law.

---

**9.** Nowhere in the record is there any mention of any other instruction or order given by Rutherford.

**10.** In a statement given to Oroville Police Department Sgt. Nicholson on the day of the shooting, Rutherford stated that "the suspect kept coming closer to him and when the suspect went passed [sic] a similar sized tree, approximately 30 feet away from him, he decided that the subject had approached and was in an uncomfortable position for him. Deputy Rutherford felt he was in jeopardy and if he passed the tree, that he would shoot the subject. Deputy Rutherford said the weapon had already been aimed at the suspect when he noticed him approaching with the cross bow. He said that when the subject got passed [sic] the tree, he shot the round at the subject."

## I. Excessive Force

We examine the use of force to effect an arrest in light of the Fourth Amendment's prohibition on unreasonable seizures. *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Chew v. Gates,* 27 F.3d 1432, 1440 (1994). The officer's actions are measured by the standard of objective reasonableness, *Graham,* 490 U.S. at 397, 109 S.Ct. 1865. The reasonableness of the force used to effect a particular seizure is determined by "careful[ly] balancing ... 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865 (quoting *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). As we have held, "[t]he force which [i]s applied must be balanced against the need for that force." *Liston v. County of Riverside,* 120 F.3d 965, 976 (1997). *See also Alexander v. City and County of San Francisco,* 29 F.3d 1355, 1367 (9th Cir.1994).

### A. Nature and Quality of Intrusion

We first assess the quantum of force used to arrest Deorle by considering "the type and amount of force inflicted." *Headwaters Forest Def. v. County of Humboldt,* 211 F.3d 1121, 1133 (9th Cir. 2000) (internal quotation marks omitted) (quoting *Chew,* 27 F.3d at 1440). In the instant case, Rutherford shot Deorle using a lead-filled, "less-lethal" round.[11] This cloth-cased shot, which is something akin to a rubber bullet, is defined as a "long-range impact weapon."[12] It is fired from a 12–gauge shotgun, and calculated to stop "people who are violent or hostile and are threatening injury or death to themselves or others." By Rutherford's own admis-sion, the cloth-cased shot was potentially lethal at thirty feet and could be lethal at distances up to fifty feet. Also by Rutherford's own admission, "[t]he target area for lethal capabilities would probably be the facial area.... If it impacted at the heart it could stop the heart or possibly tear a vital artery." Rutherford shot at Deorle's torso from thirty feet: the round hit Deorle in the head and removed his left eye and lodged pieces of lead shot in his skull.

The force used was obviously enough to cause grave physical injury. It knocked Deorle off his feet, and removed one of his eyes. The force applied through use of the cloth-cased shot can kill a person if it strikes his head or the left side of his chest at a range of under fifty feet. Such force is much greater than that applied through the use of pepper spray, *see Headwaters Forest,* 211 F.3d at 1138, or a painful compliance hold, *see Forrester v. City of San Diego,* 25 F.3d 804, 806 (9th Cir.1994) (police force's "pain compliance unit" dispersed demonstrators using "Orcutt Police Nonchakus"—two sticks of wood connected at one end by a cord—or using wrist- and arm-twisting and pressure point holds), and more likely to cause a life-threatening injury than most dog bites. *See Vera Cruz v. City of Escondido,* 139 F.3d 659, 663 (9th Cir.1997).

However, the cloth-cased shot appears to fall short of deadly force, defined in this circuit, as "that force which is *reasonably likely* to cause death." *Vera Cruz,* at 663 (emphasis added).[13] The shot is not like a regular bullet—it does not normally rip through soft tissue and bone on contact with the human body. It is designed to knock down a target, rendering the individual incapable of resistance,

---

11. The appellees also call the cloth-cased shot a "beanbag" round. That euphemism grossly underrates the dangerousness of this projectile. The round is not some sort of "hackey-sack." It is a projectile capable of inflicting serious injury or death, rather than some children's toy.

12. *See* the affidavit of Peter A. Reedy, a Sergeant with the Sacramento Department Force for 20 years, dated March 16, 1999, and filed in support of Deorle's opposition to defendants' motion for summary judgment.

13. The extremely high deadly-force standard enunciated in *Vera Cruz* is unique to this circuit. *See id.* at 663.

without (in the normal course of deployment) resulting in death. Nonetheless, the cloth-cased shot constitutes force which carries a significant risk of serious injury, and, thus, is not to be deployed lightly.[14] To put it in terms of the test we apply: it is to be used only when a strong governmental interest compels the employment of so high a degree of force.

## B. Governmental Interests at Stake

■ We measure the governmental interests at stake by evaluating a range of factors: they include " '(1) the severity of the crime at issue, (2) whether the suspect pose[d] an immediate threat to the safety of the officers or others ... (3) whether he [was] actively resisting arrest or attempting to evade arrest by flight,' and any other 'exigent circumstances [that] existed at the time of the arrest.' " *Headwaters Forest*, 211 F.3d at 1133 (quoting *Chew*, 27 F.3d at 1440–1441 & n. 5). These factors, however, are simply a means by which to determine objectively "the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865.

■ The character of the offense is often an important consideration in determining whether the use of force was justified. *See Chew*, 27 F.3d at 1442 & n. 9; *Headwaters Forest*, 211 F.3d at 1138–1139 (same). In this case, the officers were initially on, or attempting to enter, Deorle's property without a warrant. They arrived, not to arrest him, but to investigate his peculiar behavior. Deorle was clearly a deeply troubled, emotionally disturbed individual. Mrs. Deorle testified that pain, induced by a reaction to his medication, had driven Deorle "out of control. He just didn't want to live any more." Deorle repeatedly asked officers to shoot him. Lt. Estes, reported that Deorle shouted he "ha[d] no reason to live ... that the pain was unbearable, and that he wanted to be done with the pain, and

that there was no use in continuing." Officer Johnson, Rutherford's superior, heard Deorle asking other officers to kill him. Instead of seeking to counsel Deorle, at some point the officers determined to use force to arrest him. They started by "testing" him with a police dog, and ended by firing the cloth-cased shot in his face. Deorle was eventually charged with obstructing the police in the performance of their duties. *See* Cal. Pen.Code § 69.

The problems posed by, and thus the tactics to be employed against, an emotionally distraught individual who is creating a disturbance or resisting arrest are, and must be, differentiated from those involved in efforts to subdue an armed and dangerous criminal who has recently committed a serious offense. In the former instance, increasing the use of force may, in a number of circumstances, exacerbate the situation; in the latter instance, a heightened use of less-than-lethal force will ordinarily be helpful in bringing a dangerous situation to a swift end. In the case of mentally unbalanced persons, the use of officers and others trained in the art of counseling is ordinarily advisable, and may provide the best means of ending the crisis. Even when an emotionally disturbed individual is "acting out" and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a criminal, but with a mentally ill person.

We acknowledge that police officers' decisions about the appropriate amount of force to use in a given circumstance "are often ... split-second judgments [made] in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865; *see also Washington v. Lambert*, 98 F.3d 1181, 1186 (9th Cir.1996). However, the situation here was far from that of a lone police officer suddenly confronted by a dangerous armed felon threatening immediate vio-

---

**14.** According to the affidavit of Peter A. Reedy, "[t]he Use of Force Continuum, as used in California, would list an impact weap-

on high on the schedule of force.... It would be unreasonable for an officer to use an impact weapon on an unarmed person."

lence. Rutherford was at the scene for over half an hour before he shot the emotionally disturbed Deorle. He had an opportunity to consult with his superiors before approaching to reconnoiter. *Compare Chew,* 27 F.3d at 1442. During that time, Deorle did not attempt to evade arrest by flight: he stayed on or adjacent to his own property. He did not pose an immediate safety threat: he responded to the officers' instructions and did not attack anyone. He threw down his potential weapons when ordered to do so.

Rutherford observed Deorle at close proximity for about five to ten minutes before shooting. His testimony is that he fired his shotgun as Deorle was walking towards him, at a steady gait, and without any weapons.[15] Rutherford decided that he would shoot when Deorle came within a certain range, steadied himself against a tree, and waited until Deorle reached that point; then, without a command to stop or a warning that force would be employed, he pulled the trigger. Rutherford did not make a split-second choice. *See Headwaters Forest,* 211 F.3d at 1138 (a reasonable fact finder could conclude that the decision to use non-lethal force was not made in the heat of the moment).[16] Rather, he evinced unhurried deliberation in shooting Deorle.

Of course, Deorle might never have passed the pre-determined spot had Rutherford given him the warning to which he was entitled or a command to halt. An officer must give a warning, when feasible, before shooting a suspect. *See Garner,* 471 U.S. at 11–12, 105 S.Ct. 1694; *Jensen v. City of Oxnard,* 145 F.3d 1078, 1086 (9th Cir.1998). Officers provide warnings, where possible, even when the force used is less than deadly. *See Brewer v. City of Napa,* 210 F.3d 1093, 1094–1095 (9th Cir.2000) (police officer gave warning before setting dog on suspect); *Vera Cruz,* 139 F.3d at 660 (same); *Headwaters Forest,* 211 F.3d at 1129 (police warned protesters before use of pepper spray); *Katz,* 194 F.3d at 970 (violently grabbing protester without warning and throwing him into police van was fourth amendment violation). Here, there was ample time to give a warning but no warning was given. Rutherford does not remember giving a warning; nor do any of the other eleven witnesses mention his doing so when describing the events they saw or heard.[17] At most, Rutherford may have shouted "less lethal." [18] That cryptic statement was insufficient to alert a target to the force about to be deployed, and does not satisfy the pre-use of force warning requirement.

15. Deorle was wearing no shirt or shoes, only a pair of cut-off jeans shorts. There was nowhere for him to secrete any weapons.

16. Nothing in the record before us suggests Rutherford considered other, less dangerous, methods of stopping Deorle. *See Headwaters Forest,* 211 F.3d at 1139 (holding that, where use of force is potentially lethal, police "were required to consider '[w]hat other tactics if any were available' to effect their arrest"); *Chew,* 27 F.3d at 1443 (same). In fact, other officers used a police dog to provoke him: a "police tactic that needlessly or unreasonably creates a dangerous situation necessitating an escalation in the use of force," and a course of action this circuit has expressly refused to endorse. *See Cunningham v. Gates,* 229 F.3d 1271, 1291 n. 23 (9th Cir.2000).

17. At oral argument, appellee's counsel claimed that it was Rutherford's usual practice to give a warning before shooting. While that testimony would not have changed our analysis, there is no evidence in the record before us that supports counsel's claim, and certainly no foundational evidence, such as how many times Rutherford had shot people in the past.

18. Officer Estes claims to have heard Rutherford shout "less-lethal" before firing. Officer Smith claims Rutherford shouted "less-lethal," but cannot remember whether it was before or after the shot was fired. It is just as likely that both officers heard Lt. Nichols, who admitted that he shouted "less than lethal" after Rutherford fired the cloth-cased shot "so other officers would know what had occurred." Estes and Smith are the only witnesses who remember hearing Rutherford shout such an utterance. None of Nathaniel and Jennifer Risley, Rhonda Deorle, or Mr. Stonebraker mention any warning, although they heard a shot. Officers Muldown, Collins and Nichols heard a shot but no warning, and Rutherford's affidavit does not mention any shouting of a warning before firing.

## C. Weighing the Conflicting Interests

■■■■ Viewing the facts presented by the record in the light we must, even though Rutherford used force that is properly classified as less than deadly, the force used was excessive compared to the governmental interests at stake. Deorle was obviously a deeply emotionally disturbed person. He had suffered such a severe reaction to his prescription medication that he begged various officers to shoot him to end the pain. Despite his distraught condition, however, he did not attack anyone. Instead, Officer Rutherford fired the cloth-cased round at him and left him with lead shot impacted in his skull and the cloth-cased round sticking "half out his eye." Under the fourth-amendment objective-reasonableness standard, the shooting violated Deorle's right to be free from unreasonable seizures. See Garner, 471 U.S. at 7, 105 S.Ct. 1694.[19] We now consider whether Rutherford is protected by the defense of qualified immunity.

## II. Qualified Immunity

■■■■ The individual defendants, to the extent they have been sued in their individual capacities for violating § 1983, have raised the affirmative defense of qualified immunity. The doctrine of qualified immunity insulates government agents against personal liability for money damages for actions taken in good faith pursuant to their discretionary authority. See Harlow v. Fitzgerald, 457 U.S. 800, 807, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). However, "governmental officials ... generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. at 818, 102 S.Ct. 2727.

■■■■ In excessive-force cases, this circuit measures qualified immunity by the same standard it measures the excessive force at issue. In other words, the qualified immunity test is the same as the test on the merits. See Scott v. Henrich, 39 F.3d 912, 914 (9th Cir.1994); Headwaters Forest, 211 F.3d at 1141; Alexander, 29 F.3d at 1367; Chew, 27 F.3d at 1449 n. 19. Accordingly, in line with established Ninth Circuit precedent, it is clear that because, on the facts presented, viewed in the light most favorable to the plaintiff, the force used was unreasonable, Rutherford is not entitled to qualified immunity.[20]

19. The dissent is simply wrong when it insists that the undisputed fact is that the force used against Deorle was not reasonably likely to cause serious injury. There is, at the very least, a genuine issue of material fact in the record as to that question. In any event, the question is not of substantial significance here. The "reasonably likely to cause serious injury" inquiry is a part of the deadly-force determination in all other circuits that have defined "deadly force." We have, wisely or not, rejected the test all others employ. See n.13, supra. In the case before us, however, the question is not whether the force was "deadly." Regardless of how we classify particular types of force, the evidence in the record before us makes it clear that the force used by Rutherford is quite capable of causing serious injury to the person shot. Accordingly, "deadly" or not, such force may not be used except when a strong governmental interest warrants its use, and then, only following a warning, if feasible. We should also note that to examine the possibility of serious injury, as does the dissent, on the basis of the assumption that a shot from a shotgun will hit the precise part of the body at which it is aimed by the shooter, is not only unsupported by the record, but contrary to the experience and training of law enforcement agencies.

20. We note that in at least one instance we have found the use of force unreasonable but have granted qualified immunity. In Hammer v. Gross, 932 F.2d 842, 850 (1991) (en banc) we found that under the Supreme Court cases that controlled at the time of the forcible taking of the defendant's blood over his vigorous objections, the seizure was not unlawful, but that an intervening Supreme Court decision had changed the law. Thus, one exception to our general rule is where, after the date of the incident, there has been a change in the law that renders previously permissible force impermissible. In such circumstances, the officer is entitled to qualified immunity. Such is not the case here, however. The law has never held the type of conduct displayed here to be constitutional.

We note, however, that the Supreme Court has recently granted certiorari in *Katz v. United States,* 194 F.3d 962, 967 (9th Cir.1999), *cert. granted,* —— U.S. ——, 121 S.Ct. 480, 148 L.Ed.2d 454 (2000). *Katz* collects the cases that demonstrate that the overwhelming majority of circuits that have addressed the issue of qualified immunity for unreasonable uses of force follow the same rule as the Ninth Circuit, with the Fifth Circuit being the sole exception. The Fifth Circuit's rule is set forth in *Snyder v. Trepagnier,* 142 F.3d 791 (5th Cir.1998), in which a jury found that the police officer's use of force was excessive, but then granted him qualified immunity. *Id.* at 800. The Fifth Circuit upheld the jury verdict, applying a separate qualified-immunity test that first determines whether the officer's use of force violated clearly established law, then inquires whether, on the facts as they appeared to the officer, he reasonably could have believed that he was not violating that law, or, as the Fifth Circuit put it, whether the circumstances indicate that "the officer ... ma[de] a constitutionally reasonable judgment based on a factual misperception." *Id.* (internal quotations omitted) (quoting *Melear v. Spears,* 862 F.2d 1177, 1188 (5th Cir.1989) (Higginbotham, J., concurring)). Thus, the Fifth Circuit applies a traditional qualified immunity test to excessive force cases. In the case before us, we reach the identical result applying the traditional qualified immunity test as we do applying the "same as the merits" rule that we, and most of the other circuits, follow.

 In applying the first part of the traditional qualified-immunity test— whether the law was clearly established— we start with the general proposition that the use of force that is objectively unreasonable is unlawful and that it is not necessary that a court have determined previously that the precise use of the particular force under similar circumstances is excessive. *See Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (requiring only that "the contours of the right ... be sufficiently clear that a reasonable official would understand that what he is doing violates that right"). As we said in *Mendoza v. Block:*

> We do not believe that a more particularized expression of the law is necessary for law enforcement officials ... to understand that under some circumstances the use of such a "weapon" might become unlawful. For example, no particularized case law is necessary for a deputy to know that excessive force has been used when a deputy sics a canine on a handcuffed arrestee who has fully surrendered and is completely under control. An officer is not entitled to qualified immunity on the grounds that the law is not clearly established every time a novel method is used to inflict injury.

27 F.3d at 1362 (citing *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034). It is therefore irrelevant "whether [the use of force] involves physical restraint, use of a baton, use of a gun, or use of a dog." *Id.* (citing *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034). When it should be apparent to any reasonable officer that the force he uses is excessive, there is no justification for granting qualified immunity. Deorle was a distraught, disoriented, and emotionally disturbed. Rutherford shot him using a round composed of lead shot enclosed by a cloth casing and fired at speeds of up to three-hundred feet per second from a twelve-gauge shotgun. The force, designed to render a person incapable of resistance, was listed higher on the California police's "escalation of force" chart than the other types of force short of deadly force that have sometimes been held to be excessive in this circuit. *See, e.g., Chew,* 27 F.3d at 1443. Although there is no prior case prohibiting the use of this specific type of force in precisely this type of situation, that is insufficient to entitle Rutherford to qualified immunity.

In addition, it has been long settled that an officer has a duty to warn, where feasible, before using significant force capable of causing serious injury upon an unarmed suspect. *See Garner,* 471 U.S. at 11–12,

105 S.Ct. 1694; *Quintanilla v. City of Downey*, 84 F.3d 353, 357 (9th Cir.1996). This is so whether the force is classified as deadly or less than deadly. *See Quintanilla*, 84 F.3d at 354 (police officer gave warning before setting dog on suspect); *Mendoza*, 27 F.3d at 1362 (proper, for purposes of qualified immunity inquiry, for court to determine whether officer had given warning before setting dog on suspect); *Forrester v. City of San Diego*, 25 F.3d 804, 806 (9th Cir.1994) (before each arrest, protesters warned that they would be subject to pain compliance measures if they did not move). *See also Headwaters Forest*, 211 F.3d at 1129 (police warned protesters before use of pepper spray); *Katz*, 194 F.3d at 970 (violently grabbing protester without warning and throwing him into police van was fourth amendment violation). Where a firearm is used by members of law enforcement, the phrase "Halt or I'll shoot!" has long been a part of our national culture, and it is familiar to most youngsters whether they grow up reading books, watching television, or both. The commonly acknowledged and well-known practice of warning suspects, whenever feasible, before subjecting them to force that may cause serious injury demonstrates that "the defendant['s] conduct [wa]s so patently violative of the constitutional right that reasonable officials would know without guidance from the courts that the action was unconstitutional, [and] closely analogous pre-existing case law is not required to show that the law is clearly established." *DeBoer v. Pennington*, 206 F.3d 857, 864–865 (9th Cir.2000).[21] By shooting Deorle with the cloth-cased shot without giving him a warning, Rutherford failed to act in accordance with clearly established law.

Furthermore, under the second part of the Fifth Circuit's qualified-immunity standard, Rutherford could not have reasonably believed that his actions would not violate Deorle's constitutional rights. The facts in this case are stark: as these facts appeared to Rutherford, he could not have made a reasonable judgment that the force he used was constitutional. Deorle was an emotionally disturbed individual; disoriented, "out of control," and possibly intent upon suicide. At the time Rutherford shot him, Deorle was unarmed and walking towards Rutherford at a normal gait. Despite Deorle's confused state, Rutherford determined that he would shoot at such time as Deorle reached a point thirty feet away. Without giving a warning, or even demanding that he stop his approach, Rutherford waited until Deorle came within the pre-established range, then fired. No officer could reasonably have believed that under these facts the shooting constituted reasonable force.[22] Accordingly, applying either the Ninth Circuit's standard or the Fifth Circuit's traditional qualified-immunity standard, and viewing the facts in the light most favorable to the plaintiff, Rutherford was not entitled to qualified immunity for his use of excessive force.

## CONCLUSION

Viewing the facts in the light we must, we conclude that, for purposes of summary judgment, Rutherford's use of force was excessive and the defense of qualified immunity is unavailing. At a distance of thirty feet, Rutherford shot at a man who would have been better placed in a hospital than in custody. The degree of force was clearly in excess of the governmental interest at stake, and was used in circum-

21. These cases establish that, where possible, the warning must immediately precede the use of force, *see Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir.1997) (holding that it was clearly established in 1992 that a policy mandating use of deadly force without an appropriate warning was an unconstitutional use of force), and the warning must not merely demand compliance with instructions, but advertise that the use of force will follow any

failure to comply. *See Chew*, 27 F.3d at 1443 n. 10 (citing *Reed v. Hoy*, 909 F.2d 324, 330 (9th Cir.1989)). Here, on the record before us, there was ample time to give a warning, but no warning was given.

22. Nor, as noted earlier, was the state of the law different at the time summary judgment was granted than at the time the incident occurred. *See* n.20, *supra*.

stances that did not justify the failure to warn. There was no basis for any factual misperception and no reasonable officer could have concluded that the force employed was constitutional. Accordingly, we reverse the grant of summary judgment and remand for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

SILVERMAN, Circuit Judge, dissenting:

The essential facts are not disputed. Plaintiff Richard Deorle was deranged and out of control when Deorle's wife made her 911 call to the police. When Deorle saw his wife on the telephone calling for help, he told her that they would have to come kill him.

After the first deputy sheriff (Mahon) arrived at the scene, Deorle was observed holding a two-by-six board with nails protruding from the end of it. According to Mrs. Deorle's taped-recorded statement on the day in question, Deorle "was so angry, that he just started lifting up the porch, you know the board, it has a railing and he lifted up the railing and he was like swinging it" like a baseball bat. At her deposition held three years later, Mrs. Deorle stated that he was "screaming" but not swinging the board around. Either way, the undisputed fact is that Deorle, while screaming and out of control, was in possession of a board with protruding nails, and that he finally dropped it when Mahon took his pistol out of his holster.

Mahon was able to get Deorle's wife and children safely into his police car. Mrs. Deorle told Mahon that Deorle was depressed, that he had been drinking, that he was in a rage caused by his medication, that he previously had been arrested for assaulting her in a domestic incident, and that he had been on probation.

It is undisputed that after dropping the board, Deorle picked up two hatchets and a crossbow. According to Mrs. Deorle, the crossbow was of the type used for recreational target shooting, not hunting, and that "it does look serious." In her tape-recorded interview, she recalled that when the police on the scene asked her whether her husband had any weapons, she told them, "No, except he has a crossbow."[1]

Lt. Estes heard Deorle say that he wanted to die and that he would kill anyone who came on his property. It was around this time that Deputy Rutherford arrived at the scene and was briefed on all of the above. Deorle dropped the hatchets, but continued to hold the crossbow in his right hand. In his left hand he was carrying a can of lighter fluid. He dropped the crossbow, advanced toward Rutherford and then said something to the effect of, "I'm going to kick your ass, motherfucker."

It is undisputed that Rutherford was trained in the proper use of the so-called beanbag round, which is designed to knockdown and incapacitate a person so that an arrest can be effected. The majority is right; it is not a toy, but it is not designed to kill or injure. To the contrary, it is designed to prevent serious injury. Although virtually anything can cause death or serious injury under the right circumstances and the beanbag round is no exception, see *Vera Cruz v. City of Escondido*, 139 F.3d 659 (9th Cir. 1997), the undisputed evidence established that the firing of a beanbag round from a 12–gauge shotgun at a person's "center mass" from a distance of 20 to 40 feet is not reasonably likely to cause death or serious injury.

I view these undisputed facts the way the district judge did. Deorle may have

1. It is unclear whether the crossbow was loaded. However, two days after the incident, when asked in a recorded interview about whether the crossbow was loaded, Deorle replied, "Yeah, but shit, it wouldn't even put a hole in that wall right here." He also stated that the crossbow fired a "little arrow" that "basically" had a standard point like on a normal arrow. There is nothing in the record to suggest that the crossbow was a child's toy or looked like one.

been sick, he may have been deranged, but that did not make him any less dangerous to the officers who responded to Mrs. Deorle's call for help. Deorle advanced toward Rutherford, threatening to harm him, while carrying a quart can of lighter fluid. Rutherford had no duty to wait to be doused with a flammable liquid or to be set ablaze before acting to protect himself. Rutherford may not have had the right to use deadly force at that point, but he had every right to protect himself with a degree of force likely only to temporarily incapacitate. That is what he did. The evidence is uncontradicted that the bean-bag round was fired at Deorle's lower right abdomen but that it suddenly "flew up" and unexpectedly and unintendedly hit Deorle in the face.

A key ingredient of the majority's qualified immunity analysis is its view that an officer has a duty to warn, if possible, before deploying any force, even a degree of force that is not reasonably likely to cause death or serious injury. The problem is that none of the cases cited by the majority has so held.[2] Maybe the law ought to require a police officer to give a warning before such force is used. However, the issue at the moment is whether such a requirement was clearly established on September 9, 1996, the date on which Rutherford was called to the Deorle home. It was not.

Where does this leave us? The undisputed facts show that Rutherford, without a warning, used a degree of force that was not reasonably likely to cause death or serious injury, against a deranged man whose behavior prompted his wife to call 911, who police saw in possession of a board with protruding nails, then two hatchets, then a crossbow, and who was *then* advancing toward Rutherford with a can of flammable liquid while declaring his intention to do Rutherford harm. I agree with the district judge. Rutherford is entitled to qualified immunity because a reasonable officer could have believed that his conduct was lawful. *Act Up!/Portland v. Bagley*, 988 F.2d 868 (9th Cir.1993). I would affirm the granting of summary judgment in favor of Rutherford and the Sheriff of Butte County.

---

**2.** *Brewer v. City of Napa,* 210 F.3d 1093 (9th Cir.2000); *Vera Cruz v. City of Escondido,* 139 F.3d 659 (9th Cir.1997); *Headwaters Forest Def. v. County of Humboldt,* 211 F.3d 1121 (9th Cir.2000) *superceded by* 240 F.3d 1185 (2000); *Katz v. United States,* 194 F.3d 962 (9th Cir.1999), *cert. granted,* —— U.S. ——, 121 S.Ct. 480, 148 L.Ed.2d 454 (2000).