**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

THOMAS SMITH,

       *Plaintiff-Appellant,*

v.

CITY OF HEMET, a municipal corporation; HEMET POLICE DEPARTMENT; LEE EVANSON; DAVE QUINN; AARON MEDINA; DANIEL REINBOLT; TRAINER; NATE MILLER; PETER HEWITT,

       *Defendants-Appellees.*

No. 02-56445

D.C. No.
CV-00-00811-VAP

OPINION

Appeal from the United States District Court
for the Central District of California
Virginia A. Phillips, District Judge, Presiding

Argued and Submitted
October 14, 2004—San Francisco, California

Filed January 10, 2005

Before: Mary M. Schroeder, Chief Judge, Harry Pregerson,
Stephen Reinhardt, Andrew J. Kleinfeld, Sidney R. Thomas,
Barry G. Silverman, William A. Fletcher, Richard A. Paez,
Marsha S. Berzon, Jay S. Bybee, and Consuelo M. Callahan,
Circuit Judges.

Opinion by Judge Reinhardt;
Dissent by Judge Silverman

**COUNSEL**

Robert Mann, Esq. and Donald W. Cook, Esq., Los Angeles, California, for the plaintiff-appellant.

Julie H. Biggs, City Attorney, Hemet, California; Elizabeth R. Feffer, Esq., Burke, Williams & Sorensen, LLP, Los Angeles, California, for the defendants-appellees.

**OPINION**

REINHARDT, Circuit Judge:

We took this case en banc to clarify the law regarding whether, under *Heck v. Humphrey*, 512 U.S. 477 (1994), a § 1983 action for excessive force is necessarily barred by a plaintiff's conviction under California Penal Code § 148(a)(1) for willfully resisting, delaying, or obstructing a peace officer in the performance of his duties. We also take this occasion to bring our circuit into line with the others with respect to the definition of "deadly force."

Thomas Smith appeals the district court's order granting the defendants' summary judgment motion in his § 1983

action for excessive use of force. We reverse and hold that Smith's § 1983 action is not barred by *Heck* because the excessive force may have been employed against him subsequent to the time he engaged in the conduct that constituted the basis for his conviction. In such circumstance, Smith's § 1983 action neither demonstrates nor necessarily implies the invalidity of his conviction. We also hold that in this circuit "deadly force" has the same meaning as it does in the other circuits that have defined the term, a definition that finds its origin in the Model Penal Code. We define deadly force as force that creates a substantial risk of causing death or serious bodily injury. We reverse the grant of summary judgment and remand to the district court.

## I.   FACTUAL AND PROCEDURAL HISTORY

The facts of the encounter between Smith and the police are not seriously disputed. To the extent that there is a difference between the parties, however, we look to the version most favorable to the plaintiff, the non-moving party. On the night of August 16, 1999, Smith's wife placed an emergency phone call to the Hemet Police Department ("Department") reporting that her husband "was hitting her and/or was physical with her." Mrs. Smith informed emergency personnel that her husband did not have a gun, there were no weapons in the house, and he was clad in his pajamas.

Officer Daniel Reinbolt was the first officer to arrive at the house in order to investigate the incident. He observed Smith standing on his front porch and "noticed Smith's hands in his pockets." The officer announced himself and instructed Smith to remove his hands from his pockets. Smith refused, responding with expletives and directing Officer Reinbolt to come to him. Officer Reinbolt informed Smith that he would approach, but only after Smith removed his hands from his pockets and showed that he had no weapons. Smith again refused to remove his hands from his pockets and instead entered his home.

After Officer Reinbolt advised dispatch of what had transpired, Smith reemerged onto the porch with his hands still in his pockets. Officer Reinbolt again instructed Smith to show his hands. Smith complied with this instruction, but then refused to follow an order to "put his hands on his head and walk towards [the officer's] voice[.]" Instead, Smith again asked Officer Reinbolt to approach and enter the home with him.

Officer Nate Miller arrived in response to Officer Reinbolt's radioed request for assistance. Observing Smith's refusal to cooperate with Officer Reinbolt, Officer Miller contacted dispatch to request additional assistance, including a canine unit. Officer David Quinn, a canine handler with the Department, arrived shortly thereafter with "Quando," a police canine. Officer Aaron Medina also responded to one of the assistance calls.

Officer Quinn instructed Smith to turn around and place his hands on his head. Smith again refused to obey the order, despite being informed that Quando could be sent to subdue him and might bite. Without further warning, Officer Quinn sprayed Smith in the face with pepper spray. Smith responded with expletives and attempted to reenter his residence, but the door had been locked by Mrs. Smith. Several more officers then moved onto the porch, grabbed Smith from behind, slammed him against the door, and threw him down on the porch; Officer Quinn ordered the canine to attack him. Quando bit Smith on his right shoulder and neck area. At some point, either before or after the order to attack, the dog sank his teeth into Smith's arm and clung to it.

With at least four officers surrounding him and Quando's teeth sunk into his shoulder and neck, Smith agreed to comply with the officers' orders and submit to arrest. Although Smith submitted, he admits that he was "curled up" in a fetal position in an attempt to shield himself from the dog and that one of his hands was "tucked in somewhere," still out of the offi-

cers' view. As one of the officers attempted to secure both arms, Quando was instructed by Officer Quinn to bite Smith a second time; this time the dog bit Smith on his left side and shoulder blade. Upon Officer Quinn's order, Quando ultimately retreated, and the officers dragged Smith off the porch, face down. Once off the porch, Smith continued to shield one of his arms from the dog's attack. Officer Quinn then ordered Quando to bite Smith a third time. This time, the dog bit into Smith's buttock. While all this was transpiring, Smith was pepper-sprayed at least four times, at least two of which sprayings occurred after the police dog had seized him and broken his skin, and at least one after the officers had pinned him to the ground.

Eventually, the officers secured the handcuffs on both of Smith's arms. Officer Reinbolt then washed Smith's eyes out with water from a nearby hose, but did not cleanse the wounds he received as a result of the dog bites.[1] Paramedics arrived shortly thereafter and attended to Smith's injuries.

Smith pled guilty in California Superior Court to a violation of California Penal Code § 148(a)(1).[2] Section 148(a)(1) provides: "Every person who willfully resists, delays, or obstructs any . . . peace officer . . . in the discharge or attempt to discharge any duty of his or her office or employment, . . . shall be [guilty of a misdemeanor]." Smith was sentenced to 36 months' probation.

---

[1]Although the dissent is correct that Officer Reinbolt's tape recording of the encounter between Smith and the Hemet police is about 5 minutes and 13 seconds, it neglects to mention that the tape which constitutes a part of the record is only a partial recording of the encounter. The tape, introduced by Smith, does not begin until some point after he returned to the porch from inside the house. The record is unclear as to the duration of the entire encounter. Suffice it to say that we know, given the declaration and depositions in the case, that it was substantially longer than five minutes.

[2]Smith also pled guilty to spousal battery under California Penal Code § 243(e). That conviction is not at issue in this case.

Smith filed a complaint under 42 U.S.C. § 1983 in the District Court, alleging that the officers used excessive force when they sprayed him with pepper spray and sicced the police canine on him. The defendants moved for summary judgment on several grounds, among them that *Heck v. Humphrey* bars Smith's § 1983 action and that the challenged use of force — the pepper spray and police dog — was appropriate and reasonable under the circumstances. The district court granted summary judgment on the basis that *Heck* barred Smith's § 1983 action. Judgment for the defendants was entered, and Smith filed a timely Notice of Appeal.

## II. DISCUSSION

### A. The Alleged *Heck v. Humphrey* Bar

**[1]** In *Heck v. Humphrey*, the United States Supreme Court held that:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus. . . . A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is *not* cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed . . . .

512 U.S. at 486-87. *Heck* says that "if a criminal conviction arising out of the same facts stands and is fundamentally

inconsistent with the unlawful behavior for which section 1983 damages are sought, the 1983 action must be dismissed." *Smithart v. Towery*, 79 F.3d 951, 952 (9th Cir. 1996). As the Supreme Court explained, the relevant question is whether success in a subsequent § 1983 suit would "necessarily imply" or "demonstrate" the invalidity of the earlier conviction or sentence under § 148(a)(1). *Heck*, 512 U.S. at 487; *see also Cunningham v. Gates*, 312 F.3d 1148, 1153-54 (9th Cir. 2003) (as amended) (*Heck* bars suits "based on theories that 'necessarily imply the invalidity of [the plaintiff's] convictions or sentences.' ") (quoting *Heck*, 512 U.S. at 487). We conclude that success in Smith's action would not give rise to any such necessary implication.

**[2]** Under California Penal Code § 148(a)(1), "[t]he legal elements of a violation . . . are as follows: (1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the performance of his or her duties, and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance of his or her duties." *In re Muhammed C.*, 95 Cal. App. 4th 1325, 1329 (Cal. Ct. App. 2002) (citations omitted). For a § 148(a)(1) conviction to be valid, a criminal defendant must have "resist[ed], delay[ed], or obstruct[ed]" a police officer in the *lawful* exercise of his duties. In California, the lawfulness of the officer's conduct is an essential element of the offense of resisting, delaying, or obstructing a peace officer. *See People v. Curtis*, 70 Cal. 2d 347, 354-56, 357 n.9 (1969); *Susag v. City of Lake Forest*, 94 Cal. App. 4th 1401, 1409 (Cal. Ct. App. 2002). "If the officer was not performing his or her duties *at the time of the arrest*, the arrest is unlawful and the arrestee cannot be convicted under Penal Code section 148, subdivision (a)." *Id.* (emphasis added).

**[3]** Excessive force used by a police officer at *the time of the arrest* is not within the performance of the officer's duty. *Id.*; *People v. Olguin*, 119 Cal. App. 3d 39, 45-46 (Cal. Ct. App. 1981) ("*[A]n arrest made with excessive force* is equally

unlawful. '[It] is a public offense for a peace officer to use unreasonable and excessive force *in effecting an arrest.*' ") (citation omitted) (emphasis added); *People v. White*, 101 Cal. App. 3d 161, 167 (Cal. Ct. App. 1980) ("Thus, in the present case it becomes essential for the jury to be told that if they found the *arrest was made with excessive force*, the arrest was unlawful and they should find the defendant not guilty of those charges which required the officer to be lawfully engaged in the performance of his duties ([Cal. Penal Code] §§ 245, subd. (b), 243 and 148).") (emphasis added).

**[4]** Under the definitions set forth in the California cases listed above, "the time of the arrest" does not include previous stages of law enforcement activities that might or might not lead to an arrest, such as conducting an investigation; it includes only the time during which the arrest is being *effected*. A conviction for resisting arrest under § 148(a)(1) may be lawfully obtained only if the officers do not use excessive force *in the course* of making that arrest. A conviction based on conduct that occurred *before* the officers commence the process of arresting the defendant is not "necessarily" rendered invalid by the officers' subsequent use of excessive force in making the arrest. For example, the officers do not act unlawfully when they perform investigative duties a defendant seeks to obstruct, but only afterwards when they employ excessive force in making the arrest. Similarly, excessive force used *after* a defendant has been arrested may properly be the subject of a § 1983 action notwithstanding the defendant's conviction on a charge of resisting an arrest that was itself lawfully conducted. *See, e.g., Sanford v. Motts*, 258 F.3d 1117, 1119-20 (9th Cir. 2001) (explaining that a successful § 1983 suit based on excessive force would not necessarily imply the invalidity of Sanford's conviction under § 148(a)(1) because the officer's use of excessive force occurred subsequent to the conduct for which Sanford was convicted under § 148(a)(1)).

Defendants contend that *Heck* bars Smith's § 1983 action because the lawfulness of Smith's arrest was determined in

the criminal action in which he voluntarily pled guilty. They urge that if Smith's allegations that he was subjected to excessive force during the arrest are now found to be true, that finding will necessarily imply the invalidity of his criminal conviction under § 148(a)(1). Because that conviction has not been reversed, expunged, declared invalid, or called into question by issuance of a writ of habeas corpus, defendants assert that Smith is precluded from pursuing his § 1983 claims.

Smith responds that the defendants unlawfully used excessive force against him *after* he had committed the acts on which his conviction was based, and thus that a verdict in his favor would not imply that his conviction was invalid. At the very least, Smith contends, the record does not reflect which acts underlay his plea and therefore his § 1983 action is not *necessarily* inconsistent with his conviction. Accordingly, he urges, *Heck v. Humphrey* is not a bar. We agree.

The pertinent facts are as follows: Smith engaged in at least three or four acts in violation of § 148(a)(1) before the officers used force against him. These acts of willful resistance, delay, or obstruction occurred prior to the time that the officers had determined to arrest him for any criminal conduct. Indeed, they occurred in the course of the officers' *lawful* performance of their duty to investigate whether an offense had occurred. The acts by Smith include twice refusing to take his hands out of his pockets, reentering his home once; repeatedly refusing to put his hands on his head and come down off the porch, and, finally refusing to put his hands on his head and turn around. Each of these acts constituted a violation of § 148(a)(1) sufficient to warrant the filing of a criminal charge. Each could support a conviction under that section for obstructing the criminal investigation. *See, e.g.*, *In re Muhammed C.*, 95 Cal. App. 4th at 1329-30 (holding that defendant violated § 148(a)(1) when he refused officers' repeated requests to step away from the patrol car); *People v. Green*, 51 Cal. App. 4th 1433, 1438 (Cal. Ct. App. 1997) (affirming

§ 148(a)(1) conviction in which defendant obstructed an investigating police officer by verbally intimidating a suspected victim because "the attempt to intimidate the suspected victim *impeded the investigation*. This is the very evil which the Legislature sought to proscribe by the enactment of section 148.") (emphasis added).

Defendants do not dispute that Smith violated § 148(a)(1) when he impeded their investigation by refusing to comply with their commands and that these acts by Smith occurred before the officers came onto the porch and attempted to arrest him. Officer Quinn stated in his deposition that, based on his training and experience, he knew that Smith had violated § 148(a)(1) before the officers came onto the porch to make their arrest.[3] The City of Hemet's police practices expert

---

[3]Specifically, Officer Quinn stated:

Q: When you were approaching Mr. Smith, he was still in disobedience of the officers' commands; is that right?

A: Sure.

. . .

Q: . . . Based on your training, what are the elements for making an arrest for a violation of Section 148 of the Penal Code?

A: Somebody has to obstruct, delay, or resist a police officer in the performance of their duties.

Q: Were the officers engaged in the performance of their duties as they were giving command to Mr. Smith to put his hands on his head and step off the porch?

A: Yes.

Q: Was Mr. Smith's noncompliance with those commands obstructing or delaying the officers in the performance of their duties?

A: Yes.

Q: So based on your training and experience, Mr. Smith — that is, by the time that you're approaching him on the porch — Mr. Smith had violated Penal Code Section 148.

A: Sure.

also stated in his declaration that Smith had violated § 148(a)(1) multiple times before the defendant officers attempted to arrest him. Finally, at oral argument, counsel for the defendants made a similar concession.

While both parties agree that Smith violated § 148(a)(1) a number of times *before* the officers came onto the porch to make their arrest, it is also the case that Smith subsequently violated the statute during the course of the officers' efforts to arrest him. Once the officers were on the porch, Smith again disobeyed their commands, both after he was sprayed with pepper spray and also immediately prior to the attacks by Quando. It is, thus, clear that if Smith pled guilty to § 148(a)(1) based on his behavior *after* the officers came onto the porch, during the course of the arrest, his suit would be barred by *Heck. See Heck*, 512 U.S. at 486-87. In such case, a successful § 1983 action by Smith would necessarily mean that the officers had used excessive force to subdue him and were therefore acting unlawfully at the time his arrest was effected. In that circumstance, Smith's conviction under § 148(a)(1) would have been wrongful and a successful § 1983 suit by him would demonstrate its invalidity. *See id.*

**[5]** Under *Heck*, Smith would be allowed to bring a § 1983 action, however, if the use of excessive force occurred *subsequent to* the conduct on which his conviction was based. Specifically, Smith would be entitled to proceed below if his conviction were based on unlawful behavior that took place while he stood alone and untouched on his porch — that is, if his unlawful conduct occurred while the officers were attempting to investigate his wife's complaint. In such case, a judgment in Smith's favor would not necessarily conflict with his conviction because his acts of resistance, delay, or obstruction would have occurred while the officers were engaged in the lawful performance of their investigative duties, not while they were engaged in effecting an arrest by the use of excessive force.

The defendants' argument wrongly focuses on Smith's conduct rather than the officers'. There were two different phases of the officers' conduct here — first, the investigative phase; then, when Smith repeatedly refused to cooperate, the arrest for violating § 148(a)(1) and for the underlying offense that otherwise might or might not have led to an arrest. The officers' allegedly unlawful conduct which transpired after they decided to use physical force to subdue Smith occurred during the second phase of their law enforcement activities, during the course of their effort to take Smith into custody. Prior to that time, during the investigative phase, they had issued only verbal commands, all of which were concededly well within the bounds of their general police powers. Smith's obstruction of that investigation came to an end when the officers decided to arrest him. Thereafter, in the course of the arrest, they allegedly engaged in the use of excessive force that rendered the arrest unlawful. It did not, however, render their preceding investigation unlawful, nor would it for *Heck* purposes invalidate a conviction for obstructing that investigation. California law immunizes Smith from prosecution for any conduct that occurred at the time of, or during the course of his unlawful arrest, but it does not immunize him from prosecution for unlawful conduct that occurred prior or subsequent to that time.

**[6]** There is one remaining complication. As in *Sanford v. Motts*, "nothing in the record informs us what the factual basis for [Smith's] plea" was. 258 F.3d at 1119. There is no indication as to whether Smith's plea was based on his conduct that impeded the officers' investigation before they came onto the porch, or his subsequent resistance to their physical attempt to arrest him, or both. The record is clear that Smith pled guilty to one count of violating § 148(a)(1), but there is no information as to which of his actions constituted the basis for his plea. The charging complaint simply states that Smith violated § 148(a)(1) when he wilfully and unlawfully resisted, delayed, and obstructed the defendant officers in the discharge of, and attempt to discharge, their duty. Neither party

in its briefs or at oral argument was able to identify the facts underlying the plea or to advise us regarding what transpired at the time Smith entered his plea. It is therefore entirely possible that, as Smith asserts, he pled guilty to a violation of § 148(a)(1) on the basis of his actions during the time the officers were conducting their lawful investigation. As the officers acted lawfully in issuing orders to Smith while they were on the ground below where he was standing on his porch, his disobedience of those orders, as we have explained, would not be immunized from prosecution by the officers' subsequent unlawful acts after they decided to arrest him. Because we are unable to determine "the factual basis for [Smith's] plea," *id.*, his lawsuit does *not* necessarily imply the invalidity of his conviction and is therefore not barred by *Heck*. *Heck*, 512 U.S. at 487.

Under similar factual circumstances in *Sanford v. Motts*, we held that because there were "a variety of accusations" against the plaintiff which could have formed the basis of the § 148(a)(1) conviction, and because the challenged conduct was not *necessarily* the predicate for his plea, Sanford's § 1983 suit did not *necessarily* imply the invalidity of the conviction. 258 F.3d at 1119-20. As our dissenting colleagues aptly note, in that case we said that "[e]xcessive force used after an arrest is made does not destroy the lawfulness of the arrest" for a violation of California Penal Code § 148(a)(1). Dissent at 257 (quoting *Sanford*, 258 F.3d at 1120). Although *Sanford* involved an allegation that Officer Motts punched the plaintiff in the face after the plaintiff was arrested, the *Sanford* court did not limit its explanation of *Heck* to such a case. What the dissent ignores is that in *Sanford*, we clearly held that "Sanford's conviction required that Motts be acting lawfully in the performance of his duties '*at the time* the offense against him was committed. Hence, if Motts used excessive force subsequent to the time Sanford interfered with his duty, success in her section 1983 claim will not invalidate her conviction. *Heck* is no bar." 258 F.3d at 1120 (citation omitted) (emphasis added). Our holding in *Sanford* was that a § 1983

action is not barred by *Heck* unless the alleged excessive force occurred *at the time* the offense under § 148(a)(1) was being committed. *Id.* Thus, in this case, under *Sanford*, as long as the officers were acting lawfully *at the time* the violation of § 148(a)(1) took place, their alleged acts of excessive force, whether they occurred *before* or *after* Smith committed the acts to which he pled, would not invalidate his conviction.[4]

[7] As we have explained, a § 1983 action is not barred under *Heck* unless it is clear from the record that its successful prosecution would *necessarily* imply or demonstrate that the plaintiff's earlier conviction was invalid. Because on the record before us we cannot determine that the actions that underlay Smith's conviction upon his plea of guilty occurred at the time of or during the course of his unlawful arrest, Smith's success in the present action would not necessarily impugn his conviction. Accordingly, the defendants are not entitled to summary judgment on the basis of *Heck v. Humphrey*.[5]

(Text continued on page 245)

---

[4]Additionally, we note that other circuits have held that *Heck* does not bar § 1983 actions alleging excessive force despite the plaintiff's conviction for resisting arrest. *See, e.g., Robinson v. Doe*, 272 F.3d 921, 923 (7th Cir. 2001) (holding that a finding of excessive force in a § 1983 action would not necessarily imply the invalidity of the plaintiff's conviction for resisting arrest); *Willingham v. Loughnan*, 261 F.3d 1178, 1183 (11th Cir. 2001), *cert. granted and judgment vacated on other grounds*, 537 U.S. 801 (2002) (same); *Martinez v. City of Albuquerque*, 184 F.3d 1123, 1127 (10th Cir. 1999) (same); *Nelson v. Jashurek*, 109 F.3d 142 (3d Cir. 1997) (same); *Wells v. Bonner*, 45 F.3d 90, 95 (5th Cir. 1995) (same).

[5]The dissent relies almost exclusively on *Susag v. City of Lake Forest*. *See* 94 Cal. App. 4th at 1408-10. That case is not controlling for at least three reasons. First, the *Susag* court treated all of the acts involved, including those that immediately preceded the actual arrest, as occurring "at the time of the arrest." In *Susag*, unlike in the present case, there were not two separate phases to the incident, the investigative phase and the arrest itself. Rather, in *Susag* the court considered all of the plaintiff's actions to have occurred in connection with the arrest. For this reason alone, *Susag* is inapplicable here. Second, the discussion in *Susag* upon which the dissent relies is contained in the midst of an analysis of the proper construction

to be given *Heck v. Humphrey*. *Heck* requires the application of federal law to the particular circumstances of the plaintiff's conviction. Insofar as *Susag* purports to construe *Heck*, a federal doctrine, we are in no way controlled by it or required to afford it deference. Moreover, *Susag* misconstrues federal law in that it states, as the dissent emphasizes, that the burden shifted to the civil rights plaintiff to show that a favorable finding "would not necessarily imply the invalidity of the conviction." Federal law is to the contrary. *See Sanford*, 258 F.3d at 1119 (placing the burden on the defendants to prove that plaintiff's success in her § 1983 action would necessarily imply the invalidity of her conviction). Unless it is clear that the plaintiff's action will impugn the underlying conviction the § 1983 action may proceed. It is because of this misapplication of federal law that *Susag* reached the result it did. Accordingly, it does not bind us. Third, under California law, persons who violate § 148(a)(1) in a number of respects in the course of a single incident may be charged and convicted only once. *See People v. Simon*, 21 Cal. App. 88 (Cal. Ct. App. 1913). This rule is for the benefit of defendants and under it a general charge encompasses, and precludes further prosecution of, all the acts involved. Unlike Smith, Susag was convicted after a trial in which the prosecutor established a factual pattern of conduct sufficient for the jury to determine his guilt beyond a reasonable doubt. *Id.* at 1401-07. Where a defendant is charged with a single-act offense but there are multiple acts involved each of which could serve as the basis for a conviction, a jury does not determine which specific act or acts form the basis for the conviction. *See People v. McIntyre*, 115 Cal. App. 3d 899, 910-11 (Cal. Ct. App. 1981) ("It is only incumbent that [the jury] agree [a culpable act] occurred on that date, the exact time or sequence in relation to the [offense] is not material.") (citation omitted). Thus, a jury's verdict necessarily determines the lawfulness of the officers' actions throughout the whole course of the defendant's conduct, and any action alleging the use of excessive force would *"necessarily* imply the invalidity of his conviction." *Susag*, 94 Cal. App. 4th at 1410 (emphasis added). However, where a § 1983 plaintiff has pled guilty or entered a plea of nolo contendere, such as Smith and Sanford did, it is *not* necessarily the case that the factual basis for his conviction included the whole course of his conduct. In the case of a guilty plea or plea of nolo contendere, as the dissent acknowledges, a defendant is free to admit having committed a specific act or acts of resistance, delay, or obstruction, to identify the particular acts of unlawfulness to which he is willing to plead, and to deny that he engaged in other specific acts. Because Smith pled guilty rather than being convicted by a jury, it is entirely possible that, as he contends, his plea was based on only those

B.   The Excessive Force Claim

Smith alleges that after the officers came onto the porch they used both excessive force, generally, and deadly force, specifically, against him in contravention of the Fourth Amendment. Defendants, in contrast, urge that the force used was at all times reasonable and that we may therefore affirm the district court's summary judgment order on this alternative ground. Although we are free to affirm on any alternative basis if the record supports our doing so, we conclude that the record before us does not warrant such a result.

**[8]** A Fourth Amendment claim of excessive force is analyzed under the framework outlined by the Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989). All claims that law enforcement officers have used excessive force — deadly or otherwise — in the course of an arrest must be analyzed under the Fourth Amendment and its "reasonableness" standard. *See Graham v. Connor*, 490 U.S. at 395; *Ward v. City of San Jose*, 967 F.2d 280, 284 (9th Cir. 1992) (as amended). "It is clear that under *Graham*, excessive force claims arising before or during arrest are to be analyzed exclusively under the [F]ourth [A]mendment's reasonableness standard. . . ." *Reed v. Hoy*, 909 F.2d 324, 329 (9th Cir. 1989), *cert. denied*, 501 U.S. 1250 (1991); *see also Hammer v. Gross*, 932 F.2d 842, 845 (9th Cir. 1991) (en banc). That analysis requires balancing the "nature and quality of the intrusion" on a person's liberty with the "countervailing governmental interests at stake" to determine whether the use of force was objectively reasonable under the circumstances. *Graham*, 490 U.S. at 396.

The Supreme Court has said that "the 'reasonableness' inquiry in an excessive force case is an objective one: The

---

actions that served to obstruct the officers' investigation, all of which occurred prior to, rather than at the time of, the arrest. Thus, *Susag* is clearly distinguishable.

question is whether the officers' actions are 'objectively rea-sonable' in light of the facts and circumstances confronting them[.]" *Id.* at 397 (citations omitted); *see, e.g.*, *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001). "The question is not simply whether the force was necessary to accomplish a legitimate police objective; it is whether the force used was reasonable in light of *all* the relevant circum-stances." *Hammer v. Gross*, 932 F.2d at 846 (emphasis in original).

In *Graham*, the Supreme Court indicated that relevant fac-tors in the Fourth Amendment reasonableness inquiry include "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or oth-ers, and [3] whether he is actively resisting arrest or attempt-ing to evade arrest by flight." 490 U.S. at 396. The Court did not, however, limit the inquiry to those factors. "Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," the reasonableness of a seizure must instead be assessed by care-fully considering the objective facts and circumstances that confronted the arresting officers. *Id.* In some cases, for exam-ple, the availability of alternative methods of capturing or subduing a suspect may be a factor to consider. *See Chew v. Gates*, 27 F.3d 1432, 1441 n.5 (9th Cir. 1994).

If the evidence, reviewed in the light most favorable to Smith, could support a finding of excessive force, then the defendants are not entitled to summary judgment. "Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw infer-ences therefrom, we have held on many occasions that sum-mary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002); *see also Liston v. County of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997) (as amended) ("We have held repeatedly that the reasonableness of force used is ordinarily a question of fact for the jury.").

This is because such cases almost always turn on a jury's credibility determinations. The case before us is no different.

**[9]** First, it is necessary to assess the quantum of force used to arrest Smith. "The three factors articulated in *Graham*, and other factors bearing on the reasonableness of a particular application of force, are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure — an analysis the district court never explicitly undertook." *Chew v. Gates*, 27 F.3d at 1441. By even the defendants' account, the force used against Smith was severe. The Hemet Police Department's use of force policy, General Order U-102, classifies the use of both pepper spray and a police service dog as "intermediate" force. Defendants acknowledge that they employed both types of force, and that "intermediate" force is the most severe force authorized short of deadly force. On Smith's account, the officers' use of force was even greater. As Smith puts it, the officers pepper-sprayed him four times, one of which occurred after they had him pinned down, and sicced Quando on him three times. Under the facts as we must assess them for purposes of this appeal, the officers slammed Smith against the wall, threw him to the ground, slid him off the porch while face down, pepper-sprayed him repeatedly, and either permitted or instructed Quando to attack him on three occasions,[6] at least one such attack occurring while the officers had him pinned to the ground. The canine assault resulted in Quando's teeth puncturing the skin on various parts of Smith's body. As well, Smith stated in his deposition that the effect of the pepper

---

[6]There is a question of fact which only a jury can resolve as to whether the police canine initially attacked Smith even prior to Officer Quinn's instruction. In his deposition, Smith stated that the dog began attacking him when he was slammed against the door by Officers Medina, Miller, and Reinbolt. However, defendants claim in their declarations that Quando was ordered to attack only after the officers wrestled Smith to the ground. We leave the ultimate significance of this factual disagreement to the parties to resolve at trial; it is of no consequence for our purposes here. Either way, summary judgment was not proper.

spray was exacerbated because, although the officers flushed out Smith's eyes after he was arrested, they did not flush out the pepper spray in the wounds from the dog bites on his neck, arm, shoulder, back, and buttock.

**[10]** Next, it is necessary to apply the *Graham* criteria, beginning with the "most important single element of the three specified factors: whether the suspect poses an immediate threat to the safety of the officers or others." *Id.* The record does not reveal any basis for believing that Smith was armed or that he posed an immediate threat to anyone's safety. Smith's wife had informed the police that he had no guns or weapons in the house and that he was in his pajamas. Except for the time when he reentered his home, he was in plain view of the officers. Although he initially refused to comply with Officer Reinbolt's instruction to remove his hands from his pajama pockets, he ultimately did so before the officers used any physical force to restrain him. There is no indication in the record that after Smith removed his hands from his pockets there was any reason to believe that he possessed any weapon or posed any immediate threat to the safety of the officers or others. In fact, the defendants concede in their depositions that Smith did not pose a significant threat of death or serious injury. One of the defendant officers, Officer Quinn, stated in his declaration that Smith made no threats, verbal or physical, toward him or anyone else. Although it is true that until both of his arms were handcuffed, Smith continued to shield one arm from the officers and their dog and to shout expletives at the officers, considering the evidence in the light most favorable to him, a rational jury could very well find that he did not, at any time, pose a danger to the officers or others.

**[11]** The second *Graham* factor we consider is the severity of the crime at issue. *Graham*, 490 U.S. at 396. On the evening of the incident, Smith's wife called 911 to report that her husband "was hitting her and/or was physical with her," that he had grabbed her breast very hard. Although we are mindful

of the seriousness and reprehensibility of domestic abuse, the circumstances are not such in this case as to warrant the conclusion that Smith was a particularly dangerous criminal or that his offense was especially egregious. When Officer Reinbolt arrived, Smith was standing on his porch alone and separated from his wife. He had no guns or other weapons in his possession and there were none in the house — and he was clad in his pajamas. Under these circumstances, the nature of the crime at issue provides little, if any, basis for the officers' use of physical force.

**[12]** The third *Graham* factor is whether the individual actively resisted arrest or attempted to evade arrest by flight. *Id.* Smith continually ignored the officers' requests to remove his hands from his pajamas and to place them on his head. He also reentered his home for a brief period before returning to the porch. However, Smith did not attempt to run from the officers. To the extent that he physically resisted arrest, defendants acknowledge that it lasted for only a brief time. Although Smith refused to place both his arms behind his back, he did not attack the officers or their dog. In all, it does not appear that Smith's resistance was particularly bellicose or that he showed any signs of fleeing the area.

As we have previously explained, an additional factor that we may consider in our *Graham* analysis is the availability of alternative methods of capturing or subduing a suspect. *Chew v. Gates*, 27 F.3d at 1441 n.5. Smith argues that the officers' conduct violated applicable police standards and that there were alternative techniques available for subduing him that presented a lesser threat of death or serious injury. Smith offered an expert declaration on the training of police dogs and police dog handlers. Discussing whether the officers' conduct comported with law enforcement standards, the expert relied upon California's Peace Officer Standards and Training, which are applicable to all state police officers and are a part of Department policy. He concluded that the officers could and should have used control holds to complete the

arrest rather than to sic Quando on him once they had him restrained on the ground. *See also* Hemet Chief of Police, "Use of Force," Gen. Order No. U-102 (discussing "professional presence," "compliance techniques," and other "intermediate force" less likely to cause death or serious injury). A rational jury could rely upon such evidence in assessing whether the officers' use of force was unreasonable. *See Larez v. City of Los Angeles*, 946 F.2d 630, 635 (9th Cir. 1991) (as amended) (finding that testimony of "an expert on proper police procedures and policies" was relevant and admissible); *Davis v. Mason County*, 927 F.2d 1473, 1484-85 (9th Cir. 1991) (as amended) (testimony of plaintiffs' police practices expert that officers violated law enforcement standards properly received).

**[13]** Considering the severity and extent of the force used, the three basic *Graham* factors, and the availability of other means of accomplishing the arrest, it is evident that the question whether the force used here was reasonable is a matter that cannot be resolved in favor of the defendants on summary judgment.

**[14]** Although only Smith's account of the facts matters for our analysis, on both accounts of the arrest, Smith did not attack the officers; indeed at no time did he even threaten to attack any of them, or their dog. Smith asserts that his failure to uncurl his arm from under his body was a reasonable effort to protect himself against an unreasonably excessive use of deadly force in the form of Quando, a police canine. Even excluding the question of whether the police dog constituted deadly force, a jury well could find that, given the circumstances, the totality of force used — four blasts of pepper spray, slamming Smith down onto the porch, dragging him off the porch face down, ordering the canine to attack him three times, and the resultant dog bites and physical assaults on his body — was unreasonable. We have indeed held on past occasions that the use of lesser force could be unreasonable in the particular circumstances. *See Santos*, 287 F.3d at

853-54 (shoving can amount to excessive force when it is unreasonable); *Headwaters Forest Defense v. County of Humboldt*, 276 F.3d 1125, 1130-31 (9th Cir. 2002) (holding that the use of pepper spray on non-violent protestors was excessive force); *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998) (holding that deputies' use of a police dog is subject to excessive force analysis); *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994) (same). In sum, Smith has submitted a substantial amount of evidence from which a reasonable jury could conclude that the force used against him was excessive.[7]

## C.   Deadly Force

[15] Smith alleges that the defendants unnecessarily and unreasonably used not only excessive force against him, but also deadly force. He asserts that the latter type of force was used when Officer Quinn ordered the police canine to attack him. In *Tennessee v. Garner*, 471 U.S. 1 (1985), the Supreme Court held that a police officer may not use deadly force "unless it is necessary to prevent escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Id.*

---

[7]Defendants suggest an additional ground upon which the order for summary judgment could be affirmed: qualified immunity. Whether the officers are entitled to qualified immunity may depend in large part on factual determinations the jury will be required to make. Certainly, the use of a police canine and pepper spray could, under clearly established law, have constituted the use of excessive force in some circumstances, in which case the officers would have been put on notice that their conduct would be unconstitutional. *See Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994) ("[N]o particularized case law is necessary for a deputy to know that excessive force has been used when a deputy sics a canine on a handcuffed arrestee who has fully surrendered and is completely under control."); *see also LaLonde v. City of Riverside*, 204 F.3d 947, 961 (9th Cir. 2000) (applying the *Mendoza* rule to the use of pepper spray by police officers). We choose, however, not to resolve the issue of qualified immunity on this appeal, preferring to allow the district court to consider that question initially.

at 3. Thus, where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force. *See, e.g., Billington v. Smith*, 292 F.3d 1177, 1185 (9th Cir. 2002) (holding that deadly force was justified where a suspect violently resisted arrest, physically attacked the officer, and grabbed the officer's gun); *Reynolds v. County of San Diego*, 84 F.3d 1162, 1168 (9th Cir. 1996) (holding that deadly force was reasonable where a suspect, who had been behaving erratically, swung a knife at an officer); *Scott v. Henrich*, 39 F.3d 912, 914-15 (9th Cir. 1994) (suggesting that the use of deadly force is objectively reasonable where a suspect points a gun at officers); *Garcia v. United States*, 826 F.2d 806, 812 (9th Cir. 1987) (holding that deadly force was reasonable where the plaintiff attacked a border patrol agent with a rock and stick).

The issue presented by Smith is initially whether the use of Quando to subdue him amounted to an unreasonable use of deadly force; however, as no party to this case asserts that the use of deadly force would have been appropriate here, the issue is actually only whether the use of Quando constituted deadly force. As we are reviewing an order of summary judgment, all that we must decide is whether the use of Quando to subdue Smith *could* have amounted to deadly force under the facts of this case.

**[16]** Unfortunately, the Supreme Court did not explicitly define what constitutes deadly force in *Garner*, and the definition that we have previously announced is incorrect. In *Vera Cruz v. City of Escondido*, 139 F.3d 659, 663 (9th Cir. 1998) (as amended), this court considered the meaning of the term. In that case, we held that deadly force means "force reasonably likely to kill." *Id.* at 660. In doing so, we expressly refused to add "or result in serious bodily injury," a phrase that appears in the definition employed by all other circuits that have defined the term. *Id.* at 661-62. Similarly, we deliberately chose "reasonably likely" rather than "creates a substantial risk," the phrase employed by all other courts of

appeals to have confronted the question. *Id.* at 662-63. The definition the other circuits have adopted and that we adopt today is identical in most respects to that set forth in the Model Penal Code. *See* Model Penal Code § 3.11(2) (1962).

In *Vera Cruz*, we reviewed the Model Penal Code definition of deadly force and rejected it for three reasons. 139 F.3d at 662. First, we stated that the Model Penal Code definition, which governs criminal liability, serves a different purpose than the *Garner* standard which sets the boundaries of reasonable police conduct under the Constitution. *Id*. We were concerned that imposing personal liability on the basis of the Model Penal Code definition would "make police timid and deter activities necessary for our protection." *Id*. Second, we said that the Model Penal Code definition includes a subjective component, and that such a component constitutes "an impermissible consideration in the Fourth Amendment context," the scope of which is limited to the objective reasonableness test adopted in *Graham*. *Id*. Third, we feared that the "disjunctive 'or' would turn the deadly force rule into a 'serious bodily injury' rule, rendering *Garner*'s distinction between ordinary force and deadly force a virtual nullity." *Id*.

Smith asks us to reconsider our *Vera Cruz* ruling, and points out that seven circuits now employ the definition of "deadly force" that we rejected. Indeed, we stand alone in adopting a definition of the term that upon reconsideration we find to be unduly restrictive. *See, e.g.*, *Gutierrez v. City of San Antonio*, 139 F.3d 441, 446 (5th Cir. 1998) (deadly force "creates a substantial risk of death or serious bodily injury"); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997) (same); *In re City of Philadelphia Litigation*, 49 F.3d 945, 966 (3rd Cir. 1995) (adopting the Model Penal Code definition); *Ryder v. City of Topeka*, 814 F.2d 1412, 1416 n.11 (10th Cir. 1987) (same); *Robinette v. Barnes*, 854 F.2d 909, 912 (6th Cir. 1988) (same); *Pruitt v. City of Montgomery*, 771 F.2d 1475, 1479 n.10 (11th Cir. 1985) (same); *Mattis v. Schnarr*, 547 F.2d 1007, 1009 n.2 (8th Cir. 1976)

(en banc), *vacated as moot sub nom.*, *Ashcroft v. Mattis*, 431 U.S. 171 (1977) (same). We recognize the importance of consistency across jurisdictions, and we take this opportunity to bring our circuit into conformity with the other circuits and to adopt a definition that is more compatible with the practicalities and realities of today's physical confrontations.[8]

In *Vera Cruz*, we were concerned that the definition we rejected would "make police timid and deter activities necessary for our protection" and "would turn the deadly force rule into a 'serious bodily injury' rule, rendering *Garner*'s distinction between ordinary force and deadly force a virtual nullity." 139 F.3d at 662. However, our concerns have turned out to be overstated, and indeed unfounded. A definition including "a substantial risk of serious bodily injury" is used by police in all fifty states, the District of Columbia, and Puerto Rico, and such use has not resulted in the difficulties we feared. Equally important for this case, it is the definition that California and the Hemet Police Department use. Adopting the common definition of deadly force should impose no more of a burden on law enforcement officials than already exists throughout the nation — a burden that most law enforcement officials have voluntarily chosen to impose upon themselves. *See Garner*, 471 U.S. at 18-20 (discussing the importance of actual police department polices when adopting a Fourth Amendment rule).

The *Vera Cruz* court also criticized the Model Penal Code definition because it contained an alternative subjective component in addition to the primary objective one. Like the *Vera Cruz* court, we attribute the inclusion of an alternative subjec-

---

[8]In a footnote, the Eighth Circuit noted the conflict between *Vera Cruz* and the law in other circuits and indicated its approval of the *Vera Cruz* approach. *See Kuha v. City of Minnetonka*, 365 F.3d 590, 598 n.3 (8th Cir. 2004). Nevertheless, it applied the Model Penal Code definition, undoubtedly because that is the definition the court adopted in its en banc opinion in *Mattis*, 547 F.2d at 1009 n.2.

tive component in the Model Penal Code definition to the fact that the Model Penal Code is primarily designed to govern criminal liability. However, the definition of deadly force used in the other circuits in § 1983 cases, while frequently labeled the Model Penal Code definition, is designed for use in implementing the Fourth Amendment and necessarily differs in one minor respect from the Model Penal Code's definition. For Fourth Amendment purposes, the objective part of the test must be employed. *See Graham*, 490 U.S. at 397. In short, courts do not use the subjective alternative when they apply the "deadly force" test in § 1983 cases. We simply look to the objective part of the test: whether the force employed "creates a substantial risk of causing death or serious bodily injury." That the definition courts describe varies to this extent from the full Model Penal Code version is no reason for us not to employ a test that is now universally accepted throughout the country.

**[17]** Furthermore, the fact that we are applying a definition of deadly force to defendant police officers that is similar to the definition we use when evaluating the force used by criminal defendants need not concern us. The Supreme Court and our own court have often referred to the Model Penal Code as persuasive authority in interpreting the Constitution. *See, e.g., United States v. U.S. Gypsum Co.*, 438 U.S. 422, 444 (1978) (relying on a Model Penal Code definition, the Court stated, "[t]he ALI Model Penal Code is one source of guidance upon which the Court has relied to illuminate questions of this type"). Both the police we honor and the criminals we prosecute are subject to the same binding Constitution. We refuse to fabricate a constitutional distinction between police and civilians that, far from being based on any constitutional explanation, has been overwhelmingly rejected by judges and law enforcement officials nationwide. We erred in *Vera Cruz* when we rejected the definition that finds its origin in the Model Penal Code, and we now take this opportunity to overrule that holding and adopt the definition of deadly force used by the other circuit courts throughout the nation.

We need not here determine whether the use of a police dog to subdue a suspect constitutes deadly force generally or the circumstances under which such use might constitute such force. Having announced the definition of "deadly force" we leave to the district court the first opportunity to apply the concept to the facts of this case. We note only that while we have not in any of our prior cases found that the use of police dogs constituted deadly force,[9] we have never stated that the use of such dogs cannot constitute such force. *Cf. Robinette v. Barnes*, 854 F.2d 909, 913 (6th Cir. 1988) (although failing to find that the police dog in that case constituted deadly force, the court stated that "an officer's intent in using a police dog, or the use of an improperly trained dog, could transform the use of the dog into deadly force"). *Compare Kuha*, 365 F.3d at 598 n.3 ("[T]he use of a properly trained police dog in the course of apprehending a suspect does not constitute deadly force").

## III.  CONCLUSION

For the foregoing reasons, we reverse the district court's grant of summary judgment. On the record before us, we cannot conclude that Smith's § 1983 action is barred by *Heck*; his successful prosecution of this action will not necessarily impugn his earlier conviction. Further, considering the evidence in the light most favorable to Smith, a reasonable jury could find that the defendants used excessive force. Finally, we overrule *Vera Cruz* and adopt the universally accepted definition of the term deadly force; we do not, however, decide whether the officers used such force here, but leave that question for initial consideration following remand. The grant of defendants' motion for summary judgment is **REVERSED AND REMANDED.**

---

[9]Of course, we have heretofore applied the unduly stringent *Vera Cruz* test which we overrule today.

SILVERMAN, Circuit Judge, with whom KLEINFELD and CALLAHAN, Circuit Judges, join, dissenting:

By analyzing separately every single second of the approximately five-minute encounter between Smith and the Hemet police, the majority misses the forest for the trees. Here's the forest: From the moment the police arrived and told Smith to remove his hands from his pockets, until the police finally handcuffed him, the police were trying to subdue and detain Smith, and he resisted. The undisputed facts show that this was one continuous, uninterrupted sequence of events. The majority gets off the track by focusing on how many different ways Smith might have violated the law after the police arrived at the scene. It does not matter. What matters is that Smith's actions, however numerous, culminated in one arrest. He was then convicted, by guilty plea, of resisting an officer. In California, a conviction for resisting arrest establishes that the force used to effect the arrest was not excessive. *People v. White*, 101 Cal. App. 3d 161, 164 (1980). That is why Smith's § 1983 excessive force lawsuit is barred by *Heck*. If his lawsuit were successful, the civil judgment in his favor would be inconsistent with his criminal conviction.

The contrast between this case and *Sanford v. Motts*, 258 F.3d 1117 (9th Cir. 2001), illustrates the point. In *Sanford*, the plaintiff had already been arrested and handcuffed when she was allegedly punched in the face by Officer Motts. *Id*. at 1118. We held: "Excessive force used *after an arrest is made* does not destroy the lawfulness of the arrest" for a violation of California Penal Code § 148. *Id*. at 1120 (emphasis added). Because a successful § 1983 claim for events that took place *subsequent to* her arrest could in no way imply the invalidity of her § 148 conviction, Sanford's conviction for violating § 148 did not trigger the *Heck v. Humphrey* bar to her § 1983 lawsuit.

This is in sharp contrast to the present case where the allegedly excessive force was employed *while* Smith was being

arrested. It does not matter how many times Smith refused to take his hands out of his pockets or to step off the porch. It does not matter how many times he refused to turn around or how many times he may have flailed his arms as the police tried to handcuff him. The undisputed facts show that "there was no break," to use the words of the *Cunningham* court, between Smith's disobedience and the police response that culminated in his arrest. *See Cunningham v. Gates*, 312 F.3d 1148, 1155 (9th Cir. 2002). Smith's "provocative act" and "the police response he claims was excessive . . . are so closely interrelated, [Smith's] conviction forecloses his excessive force claim." *Id.*

This is an issue of California law, and in a case with facts very close to Smith's, the California Court of Appeal concluded that *Heck* barred a § 1983 suit where the plaintiff had been convicted of a § 148 violation involving multiple acts of resistance. *Susag v. City of Lake Forest*, 94 Cal. App. 4th 1401, 1405-06 (2002). In *Susag*, a deputy sheriff noticed a car with an expired registration and called for a tow truck. *Id.* at 1406. Although Susag initially denied owning the car, after it was hitched to the tow truck he got into the driver's seat. He was ordered out of the car "several times" but refused to get out — one act of resistance. He started the car and accelerated the engine — another act of resistance. The deputy then pepper-sprayed Susag and again ordered him to get out of the car, which Susag refused — another act of resistance. Susag then pushed one of the deputies — yet another act of resistance — and struggled with the deputies when they tried to handcuff him — a final act of resistance. A jury found him guilty of one count of violating § 148. Susag and his family subsequently brought a § 1983 suit alleging excessive force and other claims against the officers involved. *Id.* at 1407. The trial court granted summary judgment to the officers on the grounds that Susag's suit was barred by *Heck*. *Id.*

The California Court of Appeal affirmed. In doing so, the court rejected Susag's argument that the *Heck* bar did not

apply when it was unclear which act of acts of resistance formed the basis of the Susag's § 148 conviction.

> [Susag] contends the record in his criminal case, which is not before us, does not reflect which acts formed the basis for his conviction, and as a result he can pursue his section 1983 action for the officer's use of pepper spray before he was ultimately subdued and placed in the patrol car. We disagree and conclude that any claim of excessive force based on discrete acts that occurred immediately preceding [Susag's] arrest is barred by the Supreme Court's holding in *Heck v. Humphrey*, [citation omitted], since a finding in his favor would necessarily imply the invalidity of his conviction under Penal Code section 148, subdivision (a).

*Id.* at 1409-10. In addition, the Court of Appeal contrasted Susag's situation to the one presented in *Sanford*, noting that, "[Susag] has alleged no claims of excessive force that took place *after* he was finally subdued and placed in the patrol car." *Id.* at 1410. (emphasis added.)

The majority argues that Smith's conviction might have been based only on his conduct while on the porch, before any force was used; ergo, the conviction fails to establish the lawfulness of the force employed from that point on. This argument is foreclosed by *Susag*. In addition, under California's continuous course of conduct rule, Smith's conviction for resisting arrest necessarily includes all of the acts that comprise a continuous or indivisible transaction. *People v. McFarland*, 58 Cal. 2d 748, 760 (1962); *People v. Simon*, 21 Cal. App. 88, 90 (1913). The major considerations in determining whether similar acts are part of the same transaction are the amount of time elapsed between the discrete incidents, and whether there was any break in the criminal activity. *See People v. Jefferson*, 123 Cal. App. 2d 219, 221 (1954) (holding that two distinct acts of assault with a deadly weapon tak-

ing place within a fifteen minute period "were a part of the same incident, and they could not reasonably be held to constitute two separate offenses, each complete in itself, and each of which would require a separate charge"); *People v. Mota*, 115 Cal. App. 3d 227, 233 (1981). Had discrete acts of resistance taken place over the course of an hour rather than five minutes, they might not have constituted the same offense. *See People v. Moreno*, 32 Cal. App. 3d Supp. 1, 8-9 (1973) (holding two instances of violating § 148 *were* two offenses because thirty minutes elapsed between the two incidents and "[i]n the intervening space of time the defendant had completely calmed down, and ceased his criminal activity"). Here, however, it is undisputed that Smith's encounter with the Hemet police took place during one continuous, uninterrupted five-minute period.[1]

The continuous course of conduct rule is for the protection of criminal defendants like Smith. The rule bars the state from prosecuting a defendant again for acts that were part and parcel of the same continuous transaction. It is this rule that now prevents the State of California from charging Smith anew for the conduct occurring after he first refused to take his hands out of his pockets. And again for refusing to put his hands on his head. And again for not turning around. And again for not coming off the porch. And again for refusing to submit to handcuffing. Smith was charged and convicted of one count of resisting an officer that necessarily encompassed the entire sequence of events leading up to his arrest. If, for whatever reason, Smith wanted to waive the protection of that rule and plead guilty to one identified act, leaving himself open to possible prosecution for acts that otherwise would be dead letters,

---

[1] The majority says that the encounter lasted "substantially longer than five minutes." I guess that depends on what "substantially longer" means. According to Smith's brief, Officer Reinbolt, the first officer to respond, started the tape recorder when he arrived at the scene. The transcript of the recording shows that the tape was turned off after Smith had been handcuffed and was having his eyes washed out with water from a garden hose. From start to finish, the recording lasted five minutes and thirteen seconds.

it was incumbent upon him to say so. *See Susag, supra*, at 1410 ("Once the defendants met their burden of proving [Susag] had an undisturbed conviction under Penal Code section 148, subdivision (a), the burden shifted to him to provide evidence of excessive force that would not necessarily imply the invalidity of his conviction.").

The majority's citation of cases from other circuits reveals its misunderstanding of how state criminal law affects the *Heck* analysis. The question in *this* case is what a *California* resisting arrest conviction establishes. The citation to *Robinson v. Doe*, 272 F.3d 921 (7th Cir. 2001), and other federal cases arising from other states, where the criminal law is different, sheds no light on the matter. In Illinois, for example, excessive force does *not* render an arrest illegal. *Id.* at 923. ("Police might well use excessive force in effecting a perfectly lawful arrest."). As we have seen, the law is otherwise in California.[2]

To summarize: If Smith had been gratuitously sprayed with mace or bitten by the dog *after* he had been arrested, his conviction for resisting an officer would not have barred his § 1983 lawsuit. However, everything Smith complains of took place *in the course of* arresting him. The district court correctly ruled that Smith's excessive force lawsuit was barred by *Heck v. Humphrey,* and for that reason, I respectfully dissent.[3]

---

[2]It is also the rule in California that multiple acts of resistance culminating in an arrest for resisting an officer are subsumed in one California Penal Code § 148 conviction. *Susag,* 94 Cal. App. 4th at 1409-10. The majority may dislike that rule, but is not free to substitute its own view of California state law for that of the California Court of Appeal. *See Mendez v. Small*, 298 F.3d 1154, 1158 (9th Cir. 2002).

[3]Because the lawsuit is *Heck*-barred, it is unnecessary to reach, as the majority does, the question of whether the force used to arrest Smith was excessive or whether the use of the dog constituted deadly force. However, in the interest of the completeness of the story, it should be noted that prior to this incident, Quando's teeth had been capped and were incapable of inflicting deep puncture wounds. The bite wounds sustained by Smith were superficial and were cleaned at the scene by paramedics. Smith was taken to a hospital immediately after his arrest, before being booked into jail. He was evaluated at the hospital but required no further treatment of any sort.