**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FRANKIE DAVIS,
            *Plaintiff-Appellant,*

            v.

CITY OF LAS VEGAS, a political
subdivision of the State of
Nevada; LAS VEGAS METROPOLITAN
POLICE DEPARTMENT, a political
subdivision of the State of
Nevada; DAVID D. MILLER,
individually and in his official
capacity as a Las Vegas
Metropolitan Police Officer;
LEONARD MARSHALL, individually
and in his official capacity as a
Las Vegas Metropolitan Police
Officer; EXBER, INC., a Nevada
corporation, dba Las Vegas Club;
ALFRED LIBBY, individually and in
his official capacity as an emplyee
of the Las Vegas Club; PATRICK
LAPERA, individually and in his
capacity as Director of Security
for the Las Vegas Club; JOHN ORR,
individually and in his capacity as
an employee of the Las Vegas
Club; RICHARD MABE, individually
and in his capacity as an employee

No. 04-17284

D.C. No.
CV-02-00007-
JCM/PAL

OPINION

of the Las Vegas Club; SHANE
MUNDELL, individually and in his
capacity as an employee of the
Las Vegas Club,
                    *Defendants-Appellees.*

Appeal from the United States District Court
for the District of Nevada
James C. Mahan, District Judge, Presiding

Argued and Submitted
October 19, 2006—San Francisco, California

Filed February 28, 2007

Before: Stephen Reinhardt, John T. Noonan, and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge Reinhardt

**COUNSEL**

Barry Levinson, Las Vegas, Nevada, for the plaintiff-appellant.

Lyssa M. Simonelli & Robert McPeak, Las Vegas, Nevada, for defendant-appellee David Miller.

**OPINION**

REINHARDT, Circuit Judge:

Once again we confront the question whether a police officer's use of force during the arrest of an unarmed citizen was sufficiently excessive to violate the citizen's clearly-established constitutional rights. Officer David Miller of the Las Vegas Metropolitan Police Department responded to a call from the Las Vegas Club Hotel & Casino informing him

that security personnel had encountered Frankie Davis reading a magazine in an area of the Casino not open to the public. After Davis, who had been handcuffed by Casino employees and remained handcuffed throughout his encounter with Officer Miller, refused to consent to being searched by the officer, Miller slammed him head-first into a wall several times, pinned him against the floor, and punched him in the face. At some point during this encounter, Miller fractured Davis's neck. Davis was unarmed at all times.[1]

Davis filed suit against Officer Miller and other defendants under 42 U.S.C. § 1983, alleging that Miller used excessive force in violation of the Fourth Amendment in effecting his arrest. He also brought a claim against Miller under Nevada's battery statute. The district court granted Miller's motion for summary judgment as to both claims on the basis of qualified immunity and Davis appealed. We reverse the district court's grant of summary judgment as to both claims and remand for a trial on the merits.

## I.  BACKGROUND

The facts, according to Davis and the independent witnesses who support his version of the events, are as follows: On November 7, 2001, Security Officer Shane Mundell, a Casino employee, found Frankie Davis reading a magazine while sitting atop a stairwell in a non-public area of the establishment. Mundell radioed for backup and fellow Security Officer Richard Mabe responded shortly thereafter. Mabe instructed Davis to descend two flights of stairs and to approach the security officers. Davis complied.

While Davis was coming down the stairs, Mabe pulled out

---

[1]"Because we review a grant of summary judgment, we view the evidence in the light most favorable to [Davis,] the nonmoving party, and accept the version of all disputed facts most favorable to him." *Drummond v. City of Anaheim*, 343 F.3d 1052, 1054 n. 1 (9th Cir. 2003).

a set of handcuffs. Davis initially protested that handcuffs were unnecessary, but after Mabe and Mundell informed him that the handcuffs were for "everyone's safety" and that they intended to merely escort him off the property, Davis voluntarily placed his hands behind his back and was handcuffed by Mundell.

Davis was then escorted to the Casino's security office and placed in a holding area. A Casino employee contacted the Las Vegas Metropolitan Police Department, informed the dispatcher that they had someone in custody, and requested that an officer be sent to the scene. Officer Miller eventually arrived at the Casino's security office in response to the call, walked into the holding area, ordered Davis to stand, and confirmed that he was in handcuffs. Miller then patted Davis down and asked him if he could search his pockets. Davis declined to consent, but informed Miller that he was unarmed, a fact that Miller was already aware of as the result of the pat-down.

Notwithstanding Davis's refusal to consent to a search, Miller attempted to reach inside Davis's left pocket to retrieve Davis's wallet. Davis rotated his hips away from Miller in an attempt to prevent him from grabbing the wallet. Miller then pushed Davis into a corner, pinning him face-first against the wall, and again reached for the wallet. Davis pushed off the wall toward Miller, and the two engaged in a brief pushing and pulling match. Officer Miller then spun Davis around and pushed him out of the holding area and into an adjacent hallway. He then slammed Davis head-first against the wall opposite the holding area, and then swung him into another wall, also head-first. One of these head-first impacts left a sizable dent in the wall's sheet rock. Miller then threw Davis face-down onto the floor causing Davis's teeth to strike the floor. He landed on top of Davis, and placed his knee on Davis's back. Davis began wiggling and attempted to slide out from underneath Miller because he was in pain. Miller then turned

Davis over and punched him in the face. In the course of Miller's actions, he fractured Davis's neck.

Ultimately, Davis stopped moving. Officer Miller completed his search, pulled Davis up from the floor, escorted him off the property, placed him in a patrol car, and transported him to the Las Vegas City Jail. During the ride to the jail, Davis told Miller that he was in a great deal of pain. Upon arrival at the jail, Miller arranged for Davis to be held pending the filing of charges for obstructing a police officer. Davis was subsequently transported to University Medical Center by jail personnel, where he was diagnosed with a neck fracture.

The Police Department's Internal Affairs Bureau conducted an investigation of the incident and issued a report in which it concluded that Officer Miller "did not use the minimal amount of force necessary and had options other than punching the suspect in the face who was on the ground in handcuffs." Accordingly, the Department suspended Officer Miller for ten hours and ordered him to participate in "Use of Force Training."[2]

In January of 2002, Davis filed suit against Miller and other defendants, asserting, *inter alia*, a 42 U.S.C. § 1983 claim for use of excessive force and a state law battery claim against Miller. Miller and other defendants filed motions for summary judgment. The district court granted Miller's motion for summary judgment in full. Ruling from the bench, the court reasoned that summary judgment should be granted as to Davis's excessive force claim because "it's not clearly excessive force," and thus "it's not so clear that Officer Miller is not entitled to qualified immunity. He's entitled to qualified immunity, and he's, therefore, dismissed from the case." As to Davis's state law battery claim, the court ruled as follows: "let's see, Officer Miller, the state law claims, they were all

---

[2]Officer Miller had been called before Internal Affairs on at least four prior occasions, twice for complaints alleging excessive use of force.

discretionary. He's entitled to immunity on those claims as well."

On June 25, 2004 the court entered an order granting summary judgment to Officer Miller and his supervising officer, and granting partial summary judgment to the Department. Davis then requested certification of the order pursuant to Federal Rule of Civil Procedure 54(b). The court granted the request, certified the order, and entered judgment in favor of Officer Miller and his supervising officer. Davis then filed this timely appeal challenging the grant of summary judgment to Miller. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse.

## II. DISCUSSION

### A. Standard of Review

A district court's grant of summary judgment is reviewed *de novo*. *Buono v. Norton*, 371 F.3d 543, 545 (9th Cir. 2004). Its decision as to whether an officer is entitled to qualified immunity is likewise reviewed *de novo*. *Bingham v. City of Manhattan Beach,* 341 F.3d 939, 945 (9th Cir. 2003).

### B. The Section 1983 Claim

Davis's principal argument on appeal is that the district court erred in concluding that Officer Miller was entitled to qualified immunity with respect to his excessive force claim. Specifically, Davis argues that (1) his Fourth Amendment rights were violated when Officer Miller fractured his neck by slamming him head-first into a wall several times and punching him in the face while he was pinned to the floor, and (2) that a reasonable officer in Miller's position would have known that his conduct was unlawful.

In *Saucier v. Katz*, the Supreme Court held that a court should determine whether an officer is entitled to qualified

immunity by first deciding whether, "[t]aken in the light most favorable to the party asserting the injury, [ ] the facts alleged show the officer's conduct violated a constitutional right." 533 U.S. 194, 201 (2001) (citing *Siegert v. Gilley,* 500 U.S. 226, 232 (1991)). If so, the court must determine whether the right violated was clearly established such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). If we conclude that both of these inquiries are answered in the affirmative, the officer is not entitled to qualified immunity. *Id.* at 201.

## 1

[1] In assessing an excessive force claim, we must first "identify[ ] the specific constitutional right allegedly infringed by the challenged application of force. . . . The validity of the claim must then be judged by reference to the specific constitutional standard which governs that right." *Graham v. Connor*, 490 U.S. 386, 394 (1989). Here, Davis claims that Officer Miller violated his rights under the Fourth Amendment.[3] "A Fourth Amendment claim of excessive force is analyzed under the framework outlined by the Supreme Court in *Graham v. Connor*." *Smith v. City of Hemet*, 394 F.3d 689, 700 (9th Cir. 2005) (en banc). Under *Graham*, "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard." 490 U.S. at 395. This analysis "requires balancing the 'nature and quality of the intrusion' on a person's liberty with the 'countervailing gov-

---

[3]Specifically, Davis alleges that Officer Miller violated this right both by using "deadly force" in a circumstance where he could not lawfully do so, and that the force used was "unreasonable and excessive." Because we conclude that the district court's decision to grant summary judgment was erroneous with respect to Davis's claim that the force used was "unreasonable and excessive," we do not analyze whether reversal is also warranted because Officer Miller unlawfully used "deadly force."

ernmental interests at stake' to determine whether the force used was objectively reasonable under the circumstances." *Smith*, 394 F.3d at 701. Thus, "[w]e first assess the quantum of force used to arrest [the plaintiff]" and then "measure the governmental interests at stake by evaluating a range of factors." *Deorle v. Rutherford*, 272 F.3d 1272, 1279-80 (9th Cir. 2001). Factors we consider in assessing the government interests at stake include "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Courts may also consider "the availability of alternative methods of capturing or subduing a suspect." *Smith*, 394 F.3d at 701.

Davis contends that an analysis of Officer Miller's conduct under the *Graham* factors demonstrates that Miller's decision to slam the handcuffed Davis head-first into a wall several times and to punch him in the face while he was immobilized on the ground was unreasonable. Specifically, he argues that (1) trespassing on the Casino's premises and obstructing a police officer are relatively minor offenses; (2) he did not pose an immediate threat to Officer Miller or anyone else because he was handcuffed, surrounded by several security guards, and was not carrying any weapons; (3) he was not actively resisting arrest or attempting to flee but was instead resisting Miller's unlawful attempts to seize his wallet; and (4) Miller punched him in the face when he was already sprawled flat on the floor with his hands cuffed behind him.

This is hardly the first case in which we have analyzed similar claims of excessive force by police officers. In *Smith v. City of Hemet*, for example, a resident of that city alleged that police officers used excessive force when they responded to a 911 call from his wife, who claimed that he was physically abusing her. 394 F.3d at 693. The responding officers were aware that Smith was unarmed and that he was in his pajamas, but they nonetheless "slammed Smith against the wall, threw

him to the ground, slid him off the porch while face down, pepper-sprayed him repeatedly, and either permitted or instructed [a police dog] to attack him on three occasions, at least one such attack occurring while the officers had him pinned to the ground." *Id.* at 702 (internal citation omitted). Smith filed an action against the officers claiming that they had used excessive force in subduing and arresting him. *Id.* at 694. The district court granted the officers' motion for summary judgment. *Id.* at 695. On appeal, we reversed, explaining that

> [b]ecause [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly. . . . This is because such cases almost always turn on a jury's credibility determinations.

*Id.* at 701 (internal quotations omitted)(second alteration in original). Analyzing the officer's conduct in light of the *Graham* factors (and accepting Smith's version of the facts as correct), we determined that Smith did not pose an immediate threat because he was unarmed and in his pajamas, notwithstanding the fact that, prior to being handcuffed, he disregarded the officers' orders, refused to put up his hands, and was shouting expletives. *Id.* at 702. Second, we stated that an allegation of domestic violence did not "warrant the conclusion that Smith was a particularly dangerous criminal or that his offense was especially egregious." *Id.* at 702-03. Third, we noted that although Smith continued to ignore the officers' orders and physically resisted arrest, he did not attack the officers or "show[ ] any signs of fleeing the area." *Id.* at 703. Finally, we considered the "availability of alternative methods of capturing or subduing a suspect," concluding that "the officers could and should have used control holds to complete the

arrest rather than . . . sic[cing the canine] on him once they had him restrained on the ground." *Id.*

**[2]** Here, as in *Smith*, an assessment of the facts in the light most favorable to Davis shows that his Fourth Amendment rights were violated. We start our analysis by assessing the quantum of force used against Davis. We do so because the "factors articulated in *Graham*, and other factors bearing on the reasonableness of a particular application of force are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure." *Id.* at 701 (quoting *Chew v. Gates,* 27 F.3d 1432, 1441 (9th Cir. 1994). Looking at the facts in the light we must for purposes of this appeal, Officer Miller's use of force was extremely severe. After Davis refused to consent to being searched, Miller forcefully slammed him head-first against a wall, and then swung him into another wall, also head-first, thereby breaking his neck. Officer Miller then threw Davis face-down onto the floor, placed his knee on his back, and then turned him over and punched him in the face.

**[3]** Next, we must assess the governmental interest that might justify the use of such force under the *Graham* factors, starting with an assessment of "the severity of the crime at issue." *Graham*, 490 U.S. at 396. Trespassing and obstructing a police officer, as those offenses were committed by Davis, are by no means such serious offenses as to provide an officer with a reasonable basis for subduing a person by the means employed by Officer Miller. Indeed, these offenses are much less serious than the domestic violence offense at issue in *Smith*, which we held did not "warrant the conclusion that [the plaintiff] was a particularly dangerous criminal or that his offense was especially egregious." *Id.* at 702-03. Here, too, "the nature of the crime[s] at issue provide[ ] little, if any, basis for the officer[']s[ ] use of physical force." *Id.* at 703.

**[4]** Second, we assess "whether the suspect pose[d] an immediate threat to the safety of the officer[ ] or others." *Gra-*

*ham*, 490 U.S. at 396. Here, Davis posed no immediate threat to Officer Miller or to anyone else. Davis was unarmed, in handcuffs, and never attempted to harm Miller or anyone else in any way. Indeed, even if Davis had wanted to harm Miller, it would have been difficult for him to do so given that he was in handcuffs, was confined within a small area, and was surrounded by security guards. Thus, nothing in the record suggests that Davis posed an immediate threat to Miller's safety or to that of anyone else.

**[5]** Next we consider whether Davis was "actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Although Davis was somewhat uncooperative and resisted Officer Miller's attempts to search his pockets, at no point during the encounter did he attempt to flee, nor could he have done so in light of the fact that he was in handcuffs, surrounded by security guards, and confined in a small holding area. Thus, Davis was neither actively resisting arrest nor attempting to flee.

**[6]** Finally, we consider whether Miller could have used other methods to accomplish the search of Davis's pocket, *Smith*, 394 F.3d at 703; *Chew,* 27 F.3d at 1441 n. 5, assuming that he had lawful cause to do so. Viewing the facts in the light most favorable to Davis, it is clear that other, less abusive methods of conducting the search were available. Miller could have attempted to persuade Davis to submit to the search, could have obtained the assistance of the security guards who were present, could have used less force than he did in seeking to attain his objective, or, having already conducted a pat-down, could have simply waited to conduct the search until he had delivered Davis to the jail. Indeed, Miller was reprimanded by the Police Department because he "did not use the minimal amount of force necessary and had options other than punching the suspect in the face who was on the ground in handcuffs to gain compliance."

**[7]** In sum, the force used by Officer Miller was severe, the crime Davis had committed was minor, the danger to Officer

Miller was minimal as was any risk of flight, and there were many less abusive means through which Miller could have accomplished his objective. Thus, weighing the severity of the force used against the governmental interests at stake, we have no difficulty in concluding that the facts here at issue, viewed in the light most favorable to Davis, demonstrate that Officer Miller's actions were unreasonable and that Davis's Fourth Amendment rights were violated.

**2**

**[8]** Even if Officer Miller's conduct violated Davis's Fourth Amendment rights, Miller is entitled to qualified immunity if the right violated was not "clearly established." *Saucier,* 533 U.S. at 201-02. The "dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. Even where there is no federal case analyzing a similar set of facts, a plaintiff may nonetheless demonstrate that a reasonable officer would have known that the force he used was excessive. *Deorle v. Rutherford,* 272 F.3d 1272, 1285 (9th Cir. 2001). "Otherwise, officers would escape responsibility for the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct." *Id.* at 1286. In assessing the reasonableness of an officer's conduct where there is no case law directly on point, "the salient question that the Court of Appeals ought to . . . ask[ ] is whether the state of the law [at the time of the alleged wrong] gave [the defendants] fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

Here, we have no question that any reasonable officer would have known that the force used was excessive, from an elementary understanding of the obligations of law enforcement officers toward all individuals in the community they serve as well as from a review of the well-established law. As

noted earlier, *Smith* is only one of a number of our cases that inform law enforcement officers of their obligation under the Constitution to refrain from the use of excessive force. In *Drummond v. City of Anaheim*, for example, we held that "no federal case directly on point [was needed] to establish" that the conduct at issue violated clearly established law. 343 F.3d 1052, 1062 (9th Cir. 2003). Drummond suffered from a severe mental illness and, when he ran out of medication, started hallucinating and became paranoid. *Id*. at 1054. His neighbor called to request police assistance because he was afraid that Drummond would hurt himself. *Id*. When police officers responded, they decided to take him into custody for his own safety. *Id*. The officers "knock[ed] Drummond to the ground, where the officers cuffed his arms behind his back as Mr. Drummond lay on his stomach." *Id*. Two officers then placed their knees on Drummond's back and neck and remained there, even after it became obvious that he was having difficulty breathing under their weight. *Id*. at 1054-55. Drummond eventually lost consciousness and suffered permanent brain damage due to lack of oxygen. *Id*. at 1055. This court held that "[v]iewing the evidence in the light most favorable to [the plaintiff] . . . the officers had 'fair warning' that the force they used was constitutionally excessive even absent a Ninth Circuit case presenting the same set of facts. . . . *Any* reasonable officer should have known that such conduct constituted the use of excessive force." *Id*. at 1061.

**[9]** Examining the facts here at issue in the light most favorable to Davis, we readily reach the same conclusion. Any reasonable officer in Officer Miller's position would have known, in light of the *Graham* factors discussed *supra* and our case law interpreting them, that swinging a handcuffed man into a wall head-first multiple times and then punching him in the face while he lay face-down on the ground, and breaking his neck as a result, was unnecessary and excessive. *See e.g., Chew,* 27 F.3d at 1436, 1443 (holding that, under *Graham,* the fact that the defendant officer used "severe force" to arrest a suspect who did not pose an imme-

diate threat to the safety of police officers was sufficient to preclude summary judgment for the officer, notwithstanding the fact that the suspect had attempted to flee and was the subject of three outstanding felony warrants); *Palmer v. Sanderson*, 9 F.3d 1433, 1434-36 (9th Cir. 1993) (holding that an officer who, during a traffic stop, jerked the plaintiff out of his car, handcuffed him extremely tightly, forcefully shoved him into the back of a patrol car, and refused to loosen his handcuffs was not entitled to qualified immunity because no reasonable officer would have thought this conduct was constitutional); *Hansen v. Black*, 885 F.2d 642, 645 (9th Cir. 1989) (holding that police officers used excessive force when they roughly handcuffed plaintiff Hansen thereby injuring her wrist and arm after she tried to prevent them from collecting evidence and called one of the officers a "son of a bitch"). Indeed, the Department's own Internal Investigations Bureau found Officer Miller's actions unreasonable and disciplined him for "not [using] the minimal amount of force necessary" in a situation in which he had multiple, less forceful means available through which to accomplish his objective. *Cf. Deorle*, 272 F.3d at 1283. Thus, viewing the facts in the light most favorable to Davis, it is clear that a reasonable officer in Miller's position would have known that the conduct in which he engaged constituted excessive force.

Officer Miller's arguments to the contrary are far from persuasive. In support of his argument that a reasonable officer would not have known that he acted unlawfully, he cites not a single Ninth Circuit case. His reliance on out-of-circuit authority, namely *Hinton v. City of Elwood*, 997 F.2d 774 (10th Cir. 1993) and *Melton v. Shivers*, 496 F. Supp. 781 (M.D. Ala. 1980), is misplaced. In *Hinton*, the plaintiff shoved a police officer and then walked away when he was told that he was under arrest. 997 F.2d at 776. Two officers then wrestled him to the ground and attempted to handcuff him. *Id.* at 777. The plaintiff forcefully resisted being handcuffed by kicking, flailing his arms, and attempting to bite the officers. *Id.* The officers used only as much force as was nec-

essary to subdue him, eventually using a stun gun for that purpose. *Id.* Unlike the plaintiff in *Hinton,* Davis was handcuffed for the duration of his encounter with Officer Miller, did not attempt to bite or attack him and did not attempt to flee. *Hinton* is quite obviously inapposite.

*Melton* is similarly unhelpful to Officer Miller. There Melton unlawfully entered one apartment and attempted to break into another. 496 F. Supp. at 783. When police pulled him over to question him, he drove away as they approached his vehicle. *Id.* A chase ensued during which Melton attempted to run a police car off the road. *Id.* The officers caught up to Melton four times, but each time he sped away just before they were able to apprehend him. *Id.* Finally, they rammed Melton's car and were able to stop it. *Id.* at 784. Although three officers surrounded him, Melton attempted to flee and a struggle ensued during which Melton kicked one of the officers down a hill. *Id.* After a fourth officer arrived, the officers were finally able to subdue and handcuff him. *Id.* Here, unlike in *Melton,* Davis was handcuffed when his encounter with Officer Miller commenced, and Miller had already subdued Davis when he administered the final blow. Furthermore, Davis never attempted to flee nor did he injure or attempt to injure anyone. Thus, neither of the cases cited by Officer Miller supports his argument that a reasonable officer in his position would not have known that his conduct was unlawful.

**[10]** Because we conclude that a reasonable officer in Miller's position would have known that the conduct complained of by Davis constituted excessive force, we hold that Officer Miller is not entitled to qualified immunity and that the district court erred in granting summary judgment on that basis.

## C.   The State-Law Battery Claim

Davis argues that the district court erred in granting Officer Miller's motion for summary judgment as to his state law battery claim. Miller asserts that Davis waived his right to appeal

this issue by failing to oppose Miller's motion for summary judgment with respect to that claim. Davis appears to concede that he did not oppose summary judgment as to the battery claim in his written opposition to Miller's motion for summary judgment, but contends that he preserved the right to appeal this issue by filing his own motion for partial summary judgment in which he sought summary judgment as to the battery claim.

**[11]** "[I]t is a general rule that a party cannot revisit theories that it raises but abandons at summary judgment." *Bankamerica Pension Plan v. McMath*, 206 F.3d 821, 826 (9th Cir. 2000) (citing *USA Petroleum Co. v. Atlantic Richfield Co.*, 13 F.3d 1276, 1284 (9th Cir. 1994)). "A party abandons an issue when it has a full and fair opportunity to ventilate its views with respect to an issue and instead chooses a position that removes the issue from the case." *Id.* However, where, as here, a plaintiff seeks summary judgment as to a particular claim, it cannot be said that he has "taken a position that removes the issue from the case" by conceding that the defendant is entitled to summary judgment. To the contrary, in seeking summary judgment on his own behalf, a plaintiff expressly rejects the view that the defendant is entitled to summary judgment with respect to the claims on which the plaintiff seeks that relief. Accordingly, because Davis sought summary judgment with respect to the battery claim, he has not waived his right to challenge the district court's grant of summary judgment to Officer Miller with respect to that claim.

Davis contends that the district court erred in concluding that Officer Miller was immune from suit under state law and therefore entitled to summary judgment with respect to the battery claim. In support of this argument, he relies on *Yada v. Simpson* for the proposition that "a police officer who uses more force than is reasonably necessary to effect a lawful arrest commits a battery upon the person arrested." 112 Nev. 254, 256 (Nev. 1996). This quotation does not constitute a

holding; rather, it is the court's iteration of a jury instruction given in that case. In *Yada*, the Nevada Supreme Court upheld a jury verdict awarding damages on the theory that a police officer committed battery when he used excessive force in arresting the plaintiff. In upholding the verdict, the court noted that the jury had been instructed that "a police officer who uses more force than is reasonably necessary to effect a lawful arrest commits a battery upon the person arrested." *Id.* However, the court did not rule directly on the question whether the jury instruction was an accurate statement of Nevada law. Instead, the court upheld the verdict because it was "supported by substantial evidence" and was not "clearly erroneous in light of all the evidence presented," without addressing whether the claim was permissible under Nevada law. *Id.* at 256-57.

**[12]** As a general matter, under Nevada Revised Statute (NRS) 41.032 " 'no action may be brought' against any public officer based upon 'the failure to exercise or perform a discretionary function . . . whether or not the discretion involved is abused.' " *Maturi v. Las Vegas Metro. Police Dept.*, 110 Nev. 307, 309 (Nev. 1994); *see also Ortega v. Reyna*, 114 Nev. 55, 62 (Nev. 1998). A police officer exercises discretion and is thus generally immune from suit where the act at issue required "personal deliberation, decision, and judgment," rather than "obedience to orders, or the performance of a duty in which the officer is left no choice of his own." *Maturi*, 110 Nev. at 309. An officer's decision as to how to accomplish a particular seizure or search is generally considered a discretionary determination under Nevada law, and officers are therefore immune from suit as to state law claims arising therefrom in most cases. *See Ortega*, 114 Nev. at 62 (police officer entitled to immunity where he used his judgment in stopping the plaintiff, arresting her, and taking her to jail); *Maturi*, 110 Nev. at 309 (arresting officers' decision to handcuff plaintiff behind his back rather than in front was discretionary and the officers are therefore entitled to immunity);

*see also Carey v. Nevada Gaming Control Bd.*, 279 F.3d 873, 878 (9th Cir. 2002).

**[13]** However, where an officer's actions are "attributable to bad faith, immunity does not apply whether an act is discretionary or not." *Falline v. GNLV Corp.,* 107 Nev. 1004, 1009 (Nev. 1991); *see also Jordan v. State Dep't of Motor Vehicles*, 121 Nev. 44, 49 n.66 (Nev. 2005). As the Nevada Supreme Court explained,

> NRS 41.032(2) provides immunity to contractors, officers, employees, agents and political subdivisions of the State for the performance or non-performance of discretionary acts *"whether or not the discretion involved is abused."* . . . However, an abuse of discretion necessarily involves at least two factors: (1) the authority to exercise judgment or discretion in acting or refusing to act on a given matter; and (2) a lack of justification for the act or inaction decided upon. Bad faith, on the other hand, involves an implemented attitude that completely transcends the circumference of authority granted the individual or entity. In other words, an abuse of discretion occurs within the circumference of authority, and an act or omission of bad faith occurs outside the circumference of authority. Stated otherwise, an abuse of discretion is characterized by an application of unreasonable judgment to a decision that is within the actor's rightful prerogatives, whereas an act of bad faith has no relationship to a rightful prerogative even if the result is ostensibly within the actor's ambit of authority.

*Falline*, 107 Nev. at 1009 n.3 (emphasis in original). Thus, where an officer arrests a citizen in an abusive manner not as the result of the exercise of poor judgment as to the force required to make an arrest, but instead because of hostility toward a suspect or a particular class of suspects (such as

members of racial minority groups) or because of a willful or deliberate disregard for the rights of a particular citizen or citizens, the officer's actions are the result of bad faith and he is not immune from suit. *See id.* No officer has the "rightful prerogative" to engage in a malicious battery of a handcuffed citizen who is neither actively resisting arrest nor seeking to flee. Such an action, motivated by hostility or willful disregard for the law, is without the officer's "circumference of authority," even if "ostensibly within [his] ambit of authority." *Id.*

**[14]** Assessing the facts here at issue in the light most favorable to Davis, a reasonable juror could find that Officer Miller's decision to slam Davis head-first into a wall multiple times and to punch him in the face while he lay prone on the ground was not merely an exercise or abuse of discretion but instead constituted a deliberate and willful disregard for the law, or malicious conduct motivated by Officer Miller's animosity toward Davis on account of his refusal to consent to being searched or for some other reason. Whether Officer Miller's actions were in bad faith is a determination that may not be made at summary judgment, at least not where, as here, there are contested issues of material fact with respect to Officer Miller's conduct and his motivation. Accordingly, the district court erred in granting summary judgment to Officer Miller on the basis of statutory immunity.

## III.   CONCLUSION

For the forgoing reasons, we reverse the district court's grant of summary judgment to Officer Miller with respect to Davis's § 1983 excessive force claim and his state law battery claim and remand for trial.

REVERSED and REMANDED.